## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CORPORACIÓN MEXICANA DE
MANTENIMIENTO INTEGRAL,
S. DE R.L. DE C.V.,

        Petitioner,

        v.

PEMEX-EXPLORACION Y
PRODUCCION,

        Respondent.

Civil Action No. 1:10-cv-206 (AKH)

## MEMORANDUM OF LAW IN OPPOSITION TO
## RESPONDENT'S MOTION TO DISMISS THE PETITION AND IN
## SUPPORT OF PETITIONER'S MOTION TO CONFIRM ARBITRAL AWARD

KING & SPALDING LLP
Richard T. Marooney
Kana A. Ellis
1185 Avenue of the Americas
New York, NY 10036
Tel: 212-556-2100
Fax: 212-556-2222

Charles C. Correll
101 2nd Street
San Francisco, CA 94105-3664
Tel: 415-318-1200
Fax: 415-318-1300
*Attorneys for Petitioner*
CORPORACIÓN MEXICANA DE
MANTENIMIENTO INTEGRAL,
S. DE R.L. DE C.V.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PRELIMINARY STATEMENT ........................................................................................ 1

II.  STATEMENT OF FACTS ........................................................................................... 4

    A.  The EPC-1 Project and General Nature of the Underlying Dispute ...................... 4

    B.  The Arbitration Proceeding.................................................................................... 8

    C.  The Amparo Proceeding ....................................................................................... 9

    D.  The Interim Award............................................................................................... 11

    E.  The Final Award .................................................................................................. 13

    F.  PEP's New York Connections and Property ........................................................ 15

    G.  PEP's Unsuccessful Attempts to File a Nullity Proceeding in Mexico ............... 17

III.  ARGUMENT ............................................................................................................ 18

    A.  The Court Has Personal Jurisdiction over PEP.................................................... 18

    B.  Venue is Appropriate in this Court ...................................................................... 18

    C.  The Court is the Proper Forum for this Proceeding.............................................. 19

        1.  COMMISA's Choice of Forum is Entitled to Deference ........................ 19

        2.  Mexico is not an Adequate Alternative Forum......................................... 21

        3.  The Public and Private Interest Factors Weigh in
            Favor of this Forum ................................................................................. 22

    D.  No Ground Exists for Setting Aside the Award.................................................... 23

        1.  No Basis Exists to Set Aside the Award under
            Articles 5(1)(c) or (d).............................................................................. 25

        2.  No Basis Exists to Set Aside the Award under Article 5(1)(e)................. 28

    E.  The Court Should not Stay this Proceeding.......................................................... 29

    F.  This Court Should Confirm the Arbitral Award .................................................. 33

IV.  CONCLUSION.......................................................................................................... 34

i

## TABLE OF AUTHORITIES

Page

CASES

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
    257 F. Supp. 2d 681 (S.D.N.Y. 2003)...................................................................33

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
    No. 02 Civ. 467, 2003 U.S. Dist. LEXIS 8169 (S.D.N.Y. May 12, 2003)........................28-29

*China Nat'l Chartering Corp. v. Pactrans Air & Sea, Inc.*,
    No. 06 Civ. 13107, 2009 U.S. Dist. LEXIS 106074 (S.D.N.Y. Nov. 13, 2009) ...............29, 31

*Compagnie des Bauxites de Guinee v. Hammermills, Inc.*,
    No. 90-0169, 1992 WL 122712 (D.D.C. May 29, 1992)...........................................26

*Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*,
    361 F.3d 676 (2d Cir. 2004)......................................................................23-24

*Contec Corp. v. Remote Solution, Co.*,
    398 F.3d 205 (2nd Cir. 2005)........................................................................27

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
    156 F.3d 310 (2d Cir. 1998).................................................................*passim*

*Fiat S.p.A. v. Ministry of Fin. & Planning of Republic of Surin.*,
    No. 88 CIV. 6639, 1989 WL 122891 (S.D.N.Y. Oct. 12, 1989) ...................................25

*Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v.*
    *The Republic of Peru*, 655 F. Supp. 2d 361 (S.D.N.Y. 2009) ................................20-23

*Florasynth, Inc. v. Pickholz*,
    750 F.2d 171 (2d Cir. 1984)........................................................................24

*Gemini Consulting Group Inc. v. Horan Keogan Ryan Ltd.*,
    No. 06 C 3032, 2007 U.S. Dist. LEXIS 39509 (N.D. Ill. May 30, 2007) ............................26

*In Re Arbitration Between Halcot Navigation Ltd. P'ship &*
    *Stolt-Nielsen Transp. Group*, 491 F. Supp. 2d 413 (S.D.N.Y. 2007) ............................24, 27

*In Re Arbitration Between Interdigital Commc'ns Corp. &*
    *Samsung Elecs. Co.*, 528 F. Supp. 2d 340 (S.D.N.Y. 2007)....................................29, 31-33

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001)....................................................................19-20, 23

*MGM Prods. Group, Inc. v. Aeroflot Russian Airlines*,
   573 F. Supp. 2d 772 (S.D.N.Y. 2003),
   aff'd 91 Fed. Appx. 716 (2d Cir. 2004) ........................................................ 29, 32-33

*Monegasque De Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*,
   311 F.3d 488 (2d Cir. 2002)........................................................................... 20-23

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   416 F.3d 146 (2d Cir. 2005)................................................................................19

*Parsons & Whittemore Overseas Co. v. Societe Generale De
   L'Industrie Du Papier (RAKTA)*, 508 F.2d 969 (2d Cir. 1974) ......................... 24-25

*Productos Mercantiles E Industriales, S.A. v. Faberge USA Inc.*,
   23 F.3d 41 (2d Cir. 1994)....................................................................................24

*Telenor Mobile Commc'ns AS v. Storm LLC*,
   584 F.3d 396 (2d Cir. 2009)................................................................................24

*Ukrvneshprom State Foreign Econ. Enter. v. Tradeway, Inc.*,
   No. 95 Civ. 102, 1996 U.S. Dist. LEXIS 2827 (S.D.N.Y. Mar. 11, 1996) .............29

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
   126 F.3d 15, 22 (2d Cir. N.Y. 1997)....................................................................24

## STATUTES

28 U.S.C. §1391(f)(1) & (3) ...................................................................................18

28 U.S.C. §1608(b) ...............................................................................................18

## OTHER AUTHORITIES

GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION,  2819 (2009) .......................24

International Chamber of Commerce Rules ...................................................... *passim*

Inter-American Convention on International Commercial Arbitration,
   *opened for signature* Jan. 30, 1975, 104 Stat. 448, 14 I.L.M. 336
   (hereinafter "Panama Convention"). ................................................................. *passim*

Summary Record of the Third Meeting of the United Nations Conference
   on International Commercial Arbitration, UN Doc. E/CONF.26/SR.37,
   Holleaux (France) & Haight (ICC) (1958), available at www.uncitral.org ...................24

# TABLE OF EXHIBITS

Exhibit No.

**Exhibits to Declaration of Carlos Loperena Ruiz dated April 1, 2010**

Resume of Carlos Loperena Ruiz ...................................................................1

Interamerican Convention on International Commercial Arbitration of 1975 ...............................2

Article 12 of the Federal Civil Code of Mexico ............................................................3

Registration No.: 167516, Matter(s): Civil; Ninth Period; Instance:
First Chamber of the Supreme Court; Source: Federal Judicial
Weekly and its Gazette XXIX, April 2009; Decision: 1a./J. 7/2009, Page: 295. ...........................4

Registration No.:  242115, Matter(s):  Civil; Seventh Period; Instance:
Supreme Court's Third Chamber; Source: Federal Judicial Weekly
and its Gazette, Tome: 35, Fourth Part, Page 64; Registration No.: 392677,
Matter(s): Civil; Eighth Period; Instance: Collegiate Circuit Courts;
Source: Federal Judicial Weekly and its Gazette XXV, Tome: IV. 1995. 550, Page: 395. ...........5

**Exhibits to Declaration of Victor M. Frías-Garcés dated April 1, 2010**

Stamped copy of the cover letter evidencing delivery upon PEP ...................................................6

Statement of Mexican notary public, Jorge Vladimir Pons y García .............................................7

English translation and Spanish copy of email exchange between Victor M.
Frías-Garcés and Mr. Claudio Eric Deveze Montoya dated January 27, 2010...............................8

English translation and Spanish copy of e-mails and certificates issued by
DHL evidencing Respondent's refusal to receive the packages ......................................................9

Copy of Spanish translations of the Service Papers sent to Respondent. ......................................10

**Exhibits to Affidavit of Richard T. Marooney dated April 1, 2010**

English translation of Clauses 21-23 of the Contract
No. PEP-O-129/97 (the "EPC-1 Contract") containing the parties' special
arrangement for service and the parties' agreement to arbitrate disputes.....................................11

English translation of Clauses 17-19 of the Specific
Agreement for the Completion of Additional Work Under Contract
No. PEP-O-129/97 ("Convenio C") containing the parties' special arrangement
for service and the parties' agreement to arbitrate disputes..........................................................12

UPS report for Address A ............................................................................................................13

UPS report for Address B ............................................................................................14

UPS report for Address C ............................................................................................15

UPS report for Address D ............................................................................................16

UPS report for Address E ............................................................................................17

UPS report for Address F ............................................................................................18

Copy of email of service copies dated January 11, 2010, from
King & Spalding to email addresses of the Respondents ..........................................19

English translation and Spanish copy of PEP's notice of address change
to the arbitrators. ........................................................................................................20

FedEx shipment confirmation and transmittal letter from the Central Authority ..........................21

**Exhibits to Declaration of Claus von Wobeser Hoepfner dated April 21, 2010**

Curriculum vitae of Claus von Wobeser Hoepfner ........................................................22

González De Cossío, Francisco, *Arbitraje*, Editorial Porrúa, México, 2004,
p. 398, 405 ..................................................................................................................23

Mexican Supreme Court's resolution dated June 23, 2006 ..........................................24

Excerpt from PEP's Reply Memorial, at p. 178 ..........................................................25

Excerpt from Transcript, December 5, 2007, at p. 1232 ..............................................26

Excerpt from Federal Appellate Circuit Tribunal's resolution dated May 17, 2006 ....................27

Arturo González Cosío, *The Amparo Proceeding* (Porrúa, 5th ed, México 1998),
p. 139-40 ....................................................................................................................28

April 5, 2010 procedural order from the Third District Court in Civil and
Labor Matters of Monterrey ........................................................................................29

April 12, 2010 procedural orders list from the Third District Court in Civil
and Labor Matters of Monterrey ..................................................................................30

April 13, 2010 procedural order list from the Fifth District Court in
Civil Matters of Mexico City ......................................................................................31

April 16, 2010 procedural order list from the Fifth District Court in
Civil Matters of Mexico City ......................................................................................32

Rulings from the Eighth District Court of Mexico City dated May 14th
and May 26, 2008. ................................................................................................33

**Exhibits to Affidavit of Richard T. Marooney dated April 22, 2010**

Affidavit of Ken Adams Submitted in Support of COMMISA's
Memorial on the Merits as Exihibit C-96, January 26, 2007....................................34

Affidavit of Robert Hilton submitted in Support Of Claimant COMMISA's
Memorial On The Merits as Exhibit C-99, filed January 26, 2007 ...........................35

Affidavit of Tony Roberts Submitted in Support of COMMISA's
Memorial on the Merits as Exhibit C-97, January 26, 2007......................................36

Excerpts from Final Award in *Corporación Mexicana de Mantenimiento
Integral, S. de R.L. de C.V. v. PEMEX-Exploración y Producción,* International
Court of Arbitration of the International Chamber of Commerce, Case No.
13613/CCO/JRF (the "Arbitration") (full version of award was submitted
on March 5, 2010)....................................................................................................37

Interim Award in the Arbitration ...............................................................................38

Excerpts from Petroleos Mexicanos, Annual Report (Form 20-F) (December 31, 2008).............39

Excerpts from Petroleos Mexicanos, Registration Statement under the Securities Act
of 1933 (Form F-4) (2009)........................................................................................40

Petroleos Mexicanos, Prospectus (August 25, 2009)................................................41

Excerpts from Petroleos Mexicanos, Report of a Foreign Private Issuer
(Form 6-K) (March 2010).........................................................................................42

Original Spanish and Excerpts of English Translation of Terms
of Reference in the Arbitration .................................................................................43

English Translation of the Procedural Order Number One in the Arbitration
issued on December 13, 2005 ....................................................................................44

Petitioner Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("COMMISA") submits this memorandum of law in opposition to Respondent PEMEX-Exploración y Producción's ("PEP") Motion to Dismiss the Petition and in support of Petitioner's cross-motion to confirm the arbitral award.

## I.   PRELIMINARY STATEMENT

COMMISA commenced this recognition proceeding because PEP has property in this jurisdiction and has substantial connections to New York.  PEP raises capital in New York and relies upon financial institutions in New York to hold and administer the proceeds of its capital raising activities, including the 2009 issuance of $2 billion in debt securities for which PEP is an SEC co-registrant and payment of which PEP unconditionally guarantees.  PEP has consented to be sued in this jurisdiction and has appointed the Mexican consulate as its agent for service of process.  PEP's connections with this jurisdiction are significant and extensive.

This court is the only forum in which COMMISA can reach PEP's assets.  Mexican law does not allow attachment of PEP's assets, and COMMISA has no means of attaching PEP's assets in Mexico.  For these reasons, Mexico is not an adequate forum.  As signatories to both the Panama and New York Convention, the U.S. and Mexico agreed to U.S. recognition proceedings for arbitral awards such as this one. The parties knew and understood that this recognition proceeding could be commenced when they expressly agreed in their contracts that all disputes between "shall be definitely settled" through ICC arbitration.  Further, the project that is the subject of the parties' contracts had extensive U.S. connections.   Much of the engineering, procurement and construction occurred in the U.S. notwithstanding the ultimate physical location of the platforms in Mexico.

As was the case in its memorandum of law concerning service, PEP's latest memorandum of law is inaccurate and omits important information.  Each of PEP's arguments

lacks merit and has no basis in fact or law:

• PEP's argument concerning lack of personal jurisdiction is based solely upon PEP's contention that it has not been served with process. As set forth in COMMISA's memorandum of law and accompanying papers filed on April 1, 2010, PEP has been duly served. Accordingly, PEP's personal jurisdiction argument fails.

• PEP's argument regarding venue lacks merit because property that is the subject of this action is located in this jurisdiction and PEP is doing business in this forum. Tellingly, PEP does not argue that it owns no property or has no ties to this forum, because it cannot.

• PEP's argument based upon *forum non conveniens* fails because Mexican law precludes attachment of PEP's assets and Mexico is not an adequate forum. PEP's argument also fails because the private and public interest factors weigh in favor of this court. This is a summary confirmation proceeding that is decided on the parties' respective papers, declarations and exhibits. Further, a significant portion of the engineering, design, procurement, fabrication and construction activities under the parties' agreements were performed in the United States, and the United States has compelling and significant interests in ensuring the expeditious recognition of arbitral awards under the New York and Panama Conventions.

• PEP's argument that the final arbitral award ('Final Award") issued by the International Court of Arbitration of the International Chamber of Commerce ("ICC") should not be recognized pursuant to Article 5(1)(c) and (d) lacks merit because (i) PEP's arguments do not fall within the scope of those provisions, (ii) the parties submitted to the Tribunal all of the jurisdictional arguments that PEP raises now, and the Tribunal thoroughly considered and resolved the arguments in COMMISA's favor, and (iii) the Tribunal's reasoning is correct under Mexican law and PEP's arguments have no merit. PEP's arguments are based upon a gross

2

mischaracterization of the *amparo* proceeding and a misinterpretation of Mexican law.

• PEP's argument that the Final Award should not be recognized pursuant to Article 5(1)(e) because it is not binding is without merit. The parties agreed to resolve their disputes "definitely" through ICC arbitration, and an ICC award is binding immediately when issued pursuant to Article 28(6) of the ICC Rules of Arbitration (hereinafter "ICC Rules"). This is true even if a nullity proceeding occurs in Mexico. Further, the Final Award is binding even when one of the party-appointed arbitrators dissents from the Final Award, as did PEP's appointed arbitrator here. The fact that a dissenting opinion exists has no effect on the binding nature of an award.

• PEP's argument that this action should be stayed lacks merit. COMMISA has not commenced enforcement proceedings in Mexico. COMMISA filed this action on January 11, 2010. PEP attempted to file its nullity action in Mexico on March 24, 2010, but the court dismissed the action. PEP has since tried to refile its nullity action in Mexico, but a Mexican court has yet to accept the filing. Assuming a Mexican court accepts the filing, it could take anywhere between two to six years to resolve the nullity action in Mexico. Courts consistently refuse to stay recognition proceedings under these circumstances.

Finally, this Court should grant COMMISA's cross-motion to confirm the Final Award because no basis exists to set aside the Final Award. COMMISA has been trying to recover the hundreds of millions of dollars owed to it by PEP since 2002. PEP should not be allowed to delay further its payment of monies owed to COMMISA. The policies behind the Panama Convention and New York Convention, the parties' agreement to resolve their disputes definitively through binding international arbitration, as well as fundamental fairness and equity, require immediate confirmation of the arbitral award.

## II.     STATEMENT OF FACTS

COMMISA incorporates by reference its Statement of Facts from its Memorandum of Law in Opposition to PEP's Motion to Dismiss for Lack of Service filed on April 1, 2010. In addition, COMMISA sets forth the following facts below that are relevant to the current motions.[1]

### A.     The EPC-1 Project and General Nature of the Underlying Dispute

Throughout its brief, PEP mischaracterizes this dispute as one that relates solely to Mexico. But the truth is that this dispute is international in nature with significant connections to the United States.

In 1996, PEP embarked on a massive modernization of its offshore oil and gas production facilities located in the Bay of Campeche, known as the Cantrell Field. (See Affidavit of Richard T. Marooney ("Marooney Aff."), April 22, 2010, Ex. 34, Affidavit of Ken Adams Submitted in Support of COMMISA's Memorial on the Merits as Exhibit C-96, January 26, 2007, ("Adams Aff") ¶ 3.) PEP hired a U.S. company, Bechtel Corporation, to oversee the bidding for this and other projects in the Cantrell Field. (Id. ¶ 6.) KBR was one of the entities that bid on the project, using a Mexican subsidiary as required, and other international companies bid on the project. COMMISA was the winning bidder. (Id. ¶ 5.)

Demonstrating the true international character of the project, Contract No. PEP-O-129/97 (the "Contract" or "EPC-1 Contract") contained an international arbitration agreement, governed by the ICC:

> Any controversy, claim, difference, or dispute that may arise from or that is related to, or associated with, the present Contract or any instance of breach with

---

[1]       In support of COMMISA's opposition to PEP's motion to dismiss for insufficient service, COMMISA submitted Exhibit Numbers 1-21 annexed to the declarations of Mr. Ruiz (Exhibits 1-5), Mr. Frías-Garces (Exhibits 6-10) and the Affidavit of Richard T. Marooney (Exhibits 11-21) (the "Service Exhibits"). Citations to Exhibits 1-21 refer to the Service Exhibits. New exhibits submitted in support of this memorandum of law are numbered Exhibits 22-44.

the present Contract, *shall be definitively settled* through arbitration conducted in Mexico City, D.F., in accordance with the Conciliation and Arbitration Regulations of the International Chamber of Commerce that are in effect at that time. The arbitrators shall be three in number, and the language in which the arbitration shall be conducted shall be Spanish.

(Ex. 11, EPC-1 Contract at 23.3.) (emphasis added).

During the course of the project, the parties entered into numerous change orders, many of which were memorialized in *convenios*. *Convenio* C too included an international arbitration agreement:

Any difference or dispute that may arise or that is related to, or associated with this Specific Agreement C or any instance of breach with this Agreement, *shall be definitively settled* through arbitration conducted in Mexico City, D.F., in accordance with the Conciliation and Arbitration Regulations of the International Chamber of Commerce that are in effect at that time. The arbitrators shall be three in number, and the language in which the arbitration shall be conducted shall be Spanish.

(Ex. 12, Convenio C at 19.3.) (emphasis added).

The Contract required the construction of two large offshore platforms, as well as ancillary structures, for the treatment, processing and reinjection of natural gas. (Pet. ¶ 11; Ex. 34, Adams Aff. ¶ 5.) Each of the two large platforms weighed over 13,000 tons. (Ex. 34, Adams Aff. ¶ 8.) These platforms were fabricated in several large modules onshore in the U.S., and then they were shipped from the U.S. for "hookup" offshore. (*Id.* at ¶ 8.) *All* of the onshore fabrication services occurred in the U.S. at KBR's Greens Bayou facility. (*See* Marooney Aff., Ex. 35, Affidavit of Robert Hilton submitted in Support Of Claimant COMMISA's Memorial On The Merits as Exhibit C-99, filed January 26, 2007, ("Hilton Aff.") ¶ 4.) Additionally, many of the component parts and equipment were installed on the modules in the U.S. (Marooney Aff., Ex. 36, Affidavit of Tony Roberts Submitted in Support of COMMISA's Memorial on the Merits as Exhibit C-97, January 26, 2007, ("Roberts Aff.") ¶ 16.) And although the hookup of the

platforms occurred in Mexico, the plans for the hookup were designed in the U.S., the preparations were made here, and as many systems as possible were completed and commissioned here before "sail away." (*Id.* ¶ 3.)

Similarly, most of the engineering services were performed in the United States. KBR's Engineer Manager for the project was stationed in Houston and was the liaison for the project with KBR's large design team in Houston. (Ex. 35, Hilton Aff. ¶ 4.) During the project, PEP had offices at KBR's facilities in Greens Bayou and Houston, as well as at another company's offices in Houston to review and approve design changes among other things. (*Id.* ¶ 10.) Needless to say, significant design work occurred in the U.S., all maintained and managed in KBR's IPMS system in Houston. (*Id.*) In fact, one of COMMISA's claims in the arbitration was for payment for excess engineering services caused by PEP's repeated breach of contract's requirement that it return drawings to KBR within ten days.[2] Even after the platforms had "sailed away" to Mexico for hookup, design changes and work were done in Houston, where the Engineering Manager and team continued to reside. (*Id.* ¶ 5.) And as one would expect, many significant meetings were held in the U.S. (*See, e.g., Id.* ¶ 17 (meeting of all vendors and PEP related to the critical High Pressure Compressors).) PEP even issued a change order (Change Order 80) for the storage of steel that it owned in the U.S. (Ex. 34, Adams Aff. ¶ 42.)

As the Tribunal found, PEP repeatedly breached the parties' contracts by, among other things: failing to provide critical owner furnished equipment ("OFE") timely and in working order; delaying and disrupting the project in numerous ways, including breaching its contractual requirements to furnish offshore support vessels, its requirement to provide continuous access to the work site, and failing to timely issue work permits; and wrongfully taking over the platforms when COMMISA was nearly finished with the project. PEP also required the performance of

---

[2]   The Tribunal awarded the full amount of this claim, nearly $13 million. (Ex. 37, Final Award, at 733.)

significant additional works not covered by the Contract's scope of work or price. All of this resulted in hundreds of millions of dollars being owed to COMMISA. (*See* Marooney Aff., Ex. 37, Relevant Excerpts from Final Award at 732-33.)[3]

Importantly, PEP suspended the EPC-1 project on March 27, 2002 because it could not supply working OFE. (Ex. 34, Adams Aff. ¶ 61.) Between October 2002 and March 2003, the parties participated in "conciliation" proceedings before SFP (*Secretaría de la Función Pública*)—the auditing agency of the Mexican Government. During those proceedings, the parties created a three-*convenio* framework for resolving outstanding contractual issues and claims: one convenio for work performed, pay items, and change orders ("Convenio A"); one convenio for outstanding claims and technical controversies ("Convenio B"); and one convenio for additional work going forward ("Convenio C"). Convenios A and B were never signed, but the parties throughout their negotiations and arbitration referred to various claims under each heading.

Convenio C was signed, and COMMISA returned to work on January 15, 2003. (Ex. 34, Adams Aff. ¶ 68-67.) Additional disputes arose, which the parties have referred to as Convenio C claims. These are basically for the additional work PEP ordered and COMMISA performed during the Convenio C period and for the payment of the remaining contract amount of Convenio C. As the Tribunal found in its lengthy analysis of the Convenio C claims, PEP continued to breach its contractual commitments and delay and disrupt the project during this time frame. (*See* Final Award (Docket No. 7), at 228-484.)

PEP wrongfully took over the platforms on March 17, 2004, thereby ending COMMISA's work on the project. (Ex. 37, Final Award at 311-13; Ex. 34, Adams Aff. ¶¶ 75-

---

[3]  COMMISA filed a complete copy of a certified English translation of the Final Award on March 5, 2010. *See*  Docket No. 7. Because the Final Award is over 1,000 pages long, COMMISA submits excerpts of the Final Award specifically referenced in this memorandum of law attached as Exhibit 37 to the Marooney Affidavit.

76.)  COMMISA had completed 94% of the project at that point.  (Ex. 34, Adams Aff. ¶ 76.) PEP initiated the process for formal rescission of the agreements on March 29, 2004.  (Ex. 37, Final Award at 15.)  That process was suspended, however, while the parties sought to try to resolve their differences.  (*Id.*)  No agreement was reached during these negotiations.  (*Id.* at 15-16.)

### B.      The Arbitration Proceeding

COMMISA initiated the ICC proceeding on December 1, 2004.  (Ex. 37, Final Award at 6.)  PEP immediately contested jurisdiction in its very first filing with the ICC.  (*Id.*)  The Tribunal was not formed until May 4, 2005, when the ICC appointed the Chairman.  (Ex. 37, Final Award at 7.)

Under Procedural Order 1, the Tribunal bifurcated the proceedings in order to hear and decide PEP's jurisdictional defenses and COMMISA's request for interim measures before proceeding to the merits.  (*Id.*)  In March 2006, the Tribunal held a hearing on these issues.  (*Id.* at 8.)  After subsequent briefing, it issued its Interim Award on November 20, 2006.  (*Id.*)  That award is discussed in more detail below.  PEP did not challenge the Interim Award.  (Declaration of Dr. Claus Werner von Wobeser Hoepfner ("von Wobeser Decl.") ¶ 39.)

The parties then filed a series of lengthy memorials on the merits, both as to COMMISA's claims and PEP's substantial counterclaims.  (Ex. 37, Final Award at 10-11.)  The Tribunal held a full evidentiary hearing on the merits from November 27 through December 5, 2007, and the parties submitted their post-hearing memorials on February 15, 2008.  (*Id.*)  The Tribunal issued the Final Award on December 16, 2009.  (*Id.* at 735.)  The arbitrator PEP appointed dissented from the Final Award.  The other two arbitrators, including the Chairman appointed by the ICC, issued it.  (*Id.* at 735.)

### C.    The Amparo Proceeding

As stated above, COMMISA filed for arbitration on December 1, 2004.  By way of letter dated December 18, 2004, PEP filed a claim with COMMISA's bonding company under the performance bonds COMMISA had issued for the project.  (Ex. 37, Final Award at 16.)  This was nearly *six months before the ICC Tribunal was formed*.  The amount of the claim was for nearly $80 million.  In other words, PEP tried to collect on $80 million of performance bonds before the Tribunal had even been constituted.

Presented with such a large claim and without an arbitration tribunal in place to grant it any protection, COMMISA filed the *amparo* on December 23, 2004 in order to preserve the status quo.  (Ex. 37, Final Award at 16.)  *See* ICC Rule 23.2 (allowing a party to an arbitration provision to "apply to any competent judicial authority for interim or conservatory measures.").  The *amparo* court shortly thereafter issued an order to PEP to refrain from drawing on the bonds.  (Ex. 37, Final Award at 16.)  That order stayed in place during the entire time of the *amparo* proceeding, and thus the status quo was maintained.  (Ex. 37, Final Award at 16.)

The *amparo* is a very limited proceeding in which a party seeks to protect constitutional rights that may have been infringed by an authoritative act.  (von Wobeser Decl. ¶¶ 31-34; Marooney Aff., Ex. 38, Interim Award at 57-58.)  *Amparo* courts cannot award damages or decide commercial disputes.  *Id.*  It is an entirely distinct proceeding from a commercial arbitration or litigation that addresses different issues and different claims.  *Id.*

COMMISA asserted three limited claims in the *amparo*: (1) articles 40, 72 section II, and 92 of the Law of Acquisitions and Public Works (*Ley de Adquisiciones y Obras Públicas* or LAOP), and article 52 section II of the Regulations of the Law of Public Works (the Regulations), were unconstitutional and, thus, PEP's rescission of the parties' Agreements was unconstitutional; (2) PEP's rescission was untimely; and (3) PEP's rescission was based on a

statute that was no longer in effect when the rescission process was started. (Ex. 37, Final Award at 27.) COMMISA informed the *amparo* court about the ICC proceedings and specifically stated that it was *not* asserting its commercial claims for breach of contract and damages. (Ex. 37, Final Award at 31.) COMMISA could not have asserted such a claim had it desired, because *amparo* courts cannot award damages or decide commercial issues. (Ex. 37, Final Award at 31; von Wobeser Decl. ¶ 33.) Indeed, PEP's May 3, 2005 filing in the *amparo* claimed that the ICC arbitration was an adequate and proper forum to adjudicate COMMISA's claims. (von Wobeser Decl. ¶ 55.)

On August 23, 2005, the district court dismissed the *amparo*, finding that PEP had not acted in a governmental capacity when rescinding the agreements. (Ex. 37, Final Award at 16.) The Sixth Collegiate Court reversed the trial court's dismissal on May 17, 2006. (*Id.*) It referred the matter to the Mexican Supreme Court to decide the constitutionality of the law upon which PEP rescinded. The Mexican Supreme Court affirmed on June 23, 2006. Importantly, the Mexican Supreme Court found that a unilateral rescission by a governmental agency did not deny a contracting party due process because a contractor like ***COMMISA had the right to have the financial impacts of the rescission decided in a different proceeding***, which is precisely what COMMISA did in the ICC arbitration. (Ex. 37, Final Award at 297; von Wobeser Decl. ¶ 53.)

The Mexican Supreme Court then sent the case back to the appellate court to determine the two remaining issues: the timeliness of the rescission and whether PEP rescinded under the correct statute. The appellate court ruled in PEP's favor and dismissed the amparo on February 23, 2007.

Once PEP rescinds a contract, it must issue a *finiquito*, which is a final accounting. (von

Wobeser Decl. ¶ 55.)   A finiquito is PEP's contentions as to what each party owes and its position on any claims asserted.  (*Id.*)  Here, PEP issued the *finiquito* to COMMISA on April 3, 2007, although it impermissibly back-dated it to January 10, 2005.  ***Importantly, PEP admitted that the finiquito was subject to arbitration under the parties' agreements:*** "COMMISA is entitled to challenge the *finiquito* before the Mexican Courts or through an Arbitration Proceeding, thus safeguarding its rights." (Ex. 37, Final Award at 46; von Wobeser Decl., Ex. 25, PEP's Reply Memorial, at 178; *see also* von Wobeser Decl., Ex. 26, Transcript, at 1232 (similar admission).)  The *finiquito* has not been the subject of any court proceeding in Mexico, and Mexican law permits the arbitration of the *finiquito*.  (von Wobeser Decl. ¶¶ 56-57.)

### D.   The Interim Award

The Tribunal issued its Interim Award five months *after* the Mexican Supreme Court had ruled on the *amparo*.  That award thoroughly analyzed the implications, if any, of COMMISA's filing the *amparo* and the Mexican Supreme Court's ruling on it.  The Interim Award was a unanimous decision.  In pertinent part, it held:

> **111.**   The Tribunal does not agree with PEP's arguments as specified in the reasons set forth for analyzing and deciding the dispute concerning the "REQUEST FOR CONSERVATORY AND INTERIM MEASURES" (Chapter IV. Of this Award), which lead the Tribunal to conclude that the *Amparo* Proceedings initiated by COMMISA do not have the effect nor the legal consequence of modifying, much less extinguishing, the Arbitral Tribunal's jurisdiction to adjudicate over the claims that have been submitted before it, nor can any of the legal measures sought by Claimant be understood as a tacit or express waiver of its right to obtain an arbitral award adjudicating its claims.

> **144.**   On December 23, 2004, when COMMISA filed its Request for *Amparo* before the District Courts, COMMISA had already filed its Request for Arbitration before the ICC Secretariat but the Arbitral Tribunal had not yet been constituted and the file had not been delivered to the Tribunal. Further, in light of PEP's notice of December 1, 2004, notifying COMMISA that it would continue with the administrative rescission, COMMISA had to act immediately in order to prevent PEP from drawing down on the bonds. In these circumstances, the Tribunal finds that COMMISA's presentation of the Request for *Amparo* is a procedural act that falls within the scope of article 23 of the ICC Rules and article 1425 of the Code of

Commerce given that its purpose is to secure conservatory or provisional measures without interrupting the procedure set forth in the arbitration agreement.

**145. . . .**   The Tribunal agrees with Claimant's arguments, supported by the expertise of Dr. Von Wobeser, in the sense that the intention behind the *Amparo* is to declare the <u>administrative</u> rescission of the Contracts is unconstitutional (or invalid on formal grounds) and that such declaration is not subject to arbitration pursuant to Mexican law. Thus, the filing of the *Amparo* proceeding by COMMISA cannot be considered contradictory with its obligation to bring disputes arising out of the PEP Contracts to arbitration, nor as a waiver by COMMISA to its right to have recourse to arbitration. The Tribunal also agrees with Dr. Von Wobeser's analysis concluding that the arbitration and the *amparo* proceeding have different purposes (see Expert Report by Claus von Wobeser, dated February 15, 2006, pages 12–13).

Even though the relief COMMISA seeks through the *Amparo* proceedings is definitive, given that COMMISA seeks declaratory relief in the sense that the administrative rescission is unconstitutional, and a resolution so declaring would be final in this respect, its effect, if Mexican courts grant such relief, is to maintain the *status quo* as it existed prior to PEP's administrative rescission of the Contracts. As can be seen in the aforementioned argument submitted by COMMISA (paragraph 0 [sic]), if the *Amparo* is granted by the Court in the instant case, that would impede PEP from <u>administratively</u> rescinding the contracts and from drawing down on the bonds based on the public law provisions argued by PEP as its basis for rescinding the Contracts. Any such determination does not settle the subjacent contractual disputes concerning which Party breached the Contract and which Party is entitled to compensation by the other. Therefore, the Tribunal agrees that the *Amparo* proceedings initiated by COMMISA were directed towards securing a conservatory measure. This intent clearly follows from the text of COMMISA's Request for *Amparo*, where COMMISA repeatedly specifies that it is not its intention to submit the contractual disputes existing between the Parties to the Court's consideration and requests the Court from abstaining of analyzing such disputes in order for them to be addressed and settled through arbitration.

**146.**   Finally, the Tribunal observes that Dr. Von Wobeser declares that the use of the *Amparo* is a method commonly used to secure conservatory measures in order to avoid a governmental entity or other authorities from carrying out an unconstitutional act (see Expert Report by Claus von Wobeser, dated January 11, 2006, pages 48–51). Based on the foregoing, the Tribunal concludes that when the *Amparo* was filed on December 2004, COMMISA sought to stop PEP from administratively rescinding the Contracts pursuant to public law provisions, the subject matter of which cannot be brought before this Arbitral Tribunal's jurisdiction. As such, the *Amparo* proceedings are not inconsistent with the arbitration agreement set forth in the Contracts and cannot be considered as a waiver of the arbitration agreements, nor of COMMISA's right to request conservatory measures pursuant to article 23 of the ICC Rules. COMMISA's

request for provisional and definitive suspension of the rescission of the Contracts and the collection of the bonds and other actions related to the *Amparo* proceeding clearly fall within what is normally considered conservatory or interim measures. The Tribunal shall pronounce itself over the effect, if any, that may be caused by a resolution issued by Mexican courts in respect of the suspension and the conservatory measures requested by COMMISA from this Tribunal in its Request for Conservatory and Interim Measures.

(Ex. 38, Interim Award at 45, 56-58.) PEP did not seek to nullify the Interim Award at any time, let alone the time required under Mexican law. (von Wobeser Decl. ¶ 39.)

**E.   The Final Award**

The Final Award granted nearly all of COMMISA's claims. In particular, the Tribunal awarded COMMISA: $226,525,376.25 and 34,459,577.58 Mexican pesos for COMMISA's Convenio A, B and C claims; $59,576.060.42 in financing expenses (pre-judgment interest through December 31, 2006); post-judgment interest; and $7,544,536.39 in attorneys' fees and expenses. The Tribunal also granted some of PEP's counterclaims but rejected PEP's defenses, including its jurisdictional defenses and *res judicata* defenses relating to the *amparo*.

The Final Award also considered, and rejected, PEP's claims that the *amparo* proceeding divested the Tribunal of jurisdiction and that it was *res judicata* concerning COMMISA's commercial claims. The parties briefed the issue extensively, and both sides presented expert testimony on the issue. The Tribunal evaluated the issue at length. (*See* Ex. 37, Final Award at 14-57.) In general, the Final Award analyzed Mexican law's requirement of the "three identities" for *res judicata* to apply, and found that the issues involved in the arbitration were "totally alien to the issues analyzed in the *amparo* proceeding." (*Id.* at 29.) The Final Award also provides:

At the risk of being repetitive, the Tribunal must reaffirm that it is unquestionable that the breaches attributed to the parties and its legal and economic consequences (which are the matters analyzed in the arbitration proceeding) were not alleged in the amparo proceeding. As said breaches do not violate the constitutional safeguards or fundamental rights of the non-breaching

13

party, thus, they are excluded –ratione materia – from the scope of the amparo proceeding, whereby the court only remedies a violation of civil rights by laws or acts of authority. Therefore, the amparo proceeding is not the proper proceeding for solving a contractual breach or claiming damages for such breach, because, as stated above, in this proceeding only issues related to a violation of constitutional safeguards are analyzed.

(*Id.* at 31.) And the Tribunal noted that the Mexican Supreme Court specifically contemplated proceedings like the arbitration in order to find that PEP's unilateral rescission did not deprive COMMISA of its due process rights:

The Supreme Court issued the following judgment on the matter:

"(…) the rescission does not imply that a public entity may take the law into its own hands and deprive the individual which is a party to an agreement of its rights without due process, unless said entity exercises a legal power which does not violate a constitutional provision, as the Constitution does neither expressly forbid nor deny access to the administration of justice to the individual.

Actually, by exercising its power to rescind a contract, the administrative authority does not deprive the individual who entered into a contract with the Public Administration of his/her constitutional right to access the administration of justice by the courts, as the procedural instruments for efficiently challenging the legal-administrative act declaring the rescission of the contract are available for such individual (…)."

The subsequent review mentioned by the Supreme Court of Justice indicates that the analysis did not conclude with the amparo judgment – as the factual and legal grounds for the rescission were not disputed in the amparo proceeding, due to the fact that it was not the appropriate proceeding – thus, the merits of the contractual dispute would be resolved in a subsequent proceeding, namely the arbitration proceeding, where the matters related to the legitimacy of the rescission and its consequences, e.g., the items of the finiquito, were to be resolved.

(*Id.* at 45.) The Tribunal then noted PEP's admissions that its *finiquito* was in fact subject to arbitration. (*Id.* at 46.) In sum, the Final Award contains a lengthy analysis of the very issues PEP now raises in an attempt to forestall once again the payment of monies long owed COMMISA.

F.   **PEP's New York Connections and Property**

Petróleos Mexicanos ("PEMEX") and its four subsidiary entities (one of which is PEP) "comprise the state oil and gas company of the United Mexican States." (*See* Marooney Aff., Ex. 39, Petróleos Mexicanos, Annual Report (Form 20-F) (December 31, 2008), at 1.) PEMEX's operating activities take place exclusively through its four subsidiary entities. (*Id.* at 12.) PEP is the exploration and production operating subsidiary. (*Id.*)

The front page of the Form F-4 Registration Statement provides that PEP is a "co-registrant" for a $2 billion bond offering issued in 2009 pursuant to the Securities Act of 1933 the ("Bond Offering"). (*See* Marooney Aff., Ex. 40, Petróleos Mexicanos, Registration Statement under the Securities Act of 1933 (Form F-4) (2009).) The Prospectus defines "PEMEX," the issuer of the bonds, as "Petróleos Mexicanos, the subsidiary entities and these subsidiary companies." (*See* Marooney Aff., Ex. 41, Petróleos Mexicanos, Prospectus (August 25, 2009) at 4.) The Prospectus states that Petróleos Mexicanos and its subsidiary entities "together" "comprise Mexico's state oil and gas company." (*Id.*) The Prospectus states that "terms such as 'we,' 'us,' and 'our' generally refer to Petróleos Mexicanos and its consolidated subsidiaries, unless the context otherwise requires." (*Id.* at 1.) The Prospectus expressly refers to the fact that PEMEX and PEP have property in the United States. (Ex. 41, Prospectus at 15 ("you may not be able to enforce a judgment against our property in the United States except under limited circumstances specified in the Foreign Sovereign Immunities Act.").)

PEP unconditionally guarantees the payment of the principal and interest on the $2 billion Bond Offering. (Ex. 41, Prospectus.) All principal and interest payments are made in U.S. dollars and are transferred through a paying agent in New York. (*Id.* at 37.) "At all times" PEMEX and PEP maintain "a paying agent, transfer agent and registrar in New York." (*Id.* at 38.) "The payment obligations of the guarantors under the guaranty agreement will be governed

15

by and construed in accordance with the laws of the State of New York." (*Id.* at 51.)

PEMEX has entered into an Indenture Trust agreement with Deutsche Bank Trust Company Americas for Deutsche Bank to act as trustee for the Bond Offering (the "Trustee"). (Ex. 40, F-4 at Ex. 4.7, R-1.)  The Corporate Trust Office of the Trustee is "in the Borough of Manhattan, The City of New York." (*Id.* at Ex. 4.7, R-2.)  Payments of principal and interest due on the bonds flow through the trustee's office in Manhattan.  (*Id.* at Ex. 4.7, R-4.)  The trust office is located at 60 Wall Street, 27th Floor, New York, New York, 10005.  (*See* Ex. 39, Annual Report at Ex. 2.5 at 1.01.)  The office for the exchange of notes also is located in New York. (*Id.* at 10.02.)

PEP appoints "the Consul General of Mexico in New York" as its "authorized agent for service of process in any action based on the new securities that a holder may institute in any federal court (or, if jurisdiction in federal court is not available, state court) in the Borough of Manhattan." (*Id.* at 1.13.)  PEP "submits to the jurisdiction of any federal court sitting in the Borough of Manhattan, The City of New York, in any action or proceeding arising out of or based on this Indenture or the Securities and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such action in any such court . . . ." (*Id.*)

The same attorney that represented PEP in the ICC arbitration -- Jose Nestor Garcia Reza -- also issued a legal opinion on Mexican law for the Bond Offering.  (Ex. 37, Final Award at 3; Ex. 40, F-4 at Part II.)  For years, PEMEX, PEP and the other subsidiaries have been represented by Cleary Gottlieb, including in connection with the Bond Offering.  (Ex. 40, F-4 at 66.)

PEP also guarantees payment of the principal and interest of a $7 billion medium term note program pursuant to a distribution agreement between PEMEX and Calyon Securities

(USA) Inc., Citigroup Global Markets Inc., Citigroup Global Markets Limited, HSBC Securities (USA0 and Santander Investment Securities.  (Ex. 39, Annual Report at 152.)  PEP also guarantees billions of dollars in payments to a "master trust," a financing vehicle used by PEMEX, PEP and other subsidiaries to raise funds in New York for long term infrastructure projects by PEP. (*Id.* at 151.)  The trustee for the master trust is Bank of New York Melon in New York.  (*Id.*)  PEP also has relationships with many other financial institutions in New York, including Calyon, New York branch and others.  (Ex. 39, Annual Report at Ex 2.5 at 3.)

Under the Laws of Petróleos Mexicanos, "Petróleos Mexicanos and the subsidiary entities may be jointly and severally liable for the payment of national or international obligations incurred by them." (Ex. 39, Annual Report at Ex. 1.1, Article 4.)  PEP does not produce its own financial statements and its financial results are consolidated and included in PEMEX's financial statements.  (Ex. 41, Prospectus at 15, 68; Ex. 40, F-4 at 22, 68.)  In PEMEX's 6-K filed with the SEC on April 1, 2010, the "contingencies" section states that "PEMEX is involved in a number of lawsuits of various types."  One of the "main lawsuits" of "PEMEX" is the ICC arbitration with COMMISA.  (Marooney Aff., Ex. 42, Petróleos Mexicanos, Report of a Foreign Private Issuer (Form 6-K) (March 2010) at 20.)  The 6-K describes the Final Award and states that "On January 11, 2010, COMMISA requested the Court of the South [sic] District of New York to execute this award and Pemex-Exploration and Production <u>was notified about this request</u>." (*Id.*) (emphasis added).  PEMEX set aside a significant reserve to cover these litigation contingencies, including this action. (*Id.*)

G.   **PEP's Unsuccessful Attempts to File a Nullity Proceeding in Mexico**

On March 24, 2010, PEP filed a complaint to nullify the Final Award in the Third Judicial District Court on Civil and Labor Matters for State of Nuevo Leon, Mexico. (Tracey Suppl. Decl. ¶ 3.)  On April 6, 2010, the court dismissed PEP's complaint for lack of jurisdiction.

(*Id.* ¶ 6 & Ex. S.)  PEP has filed an appeal of the court's order with the Unitary District Court in Monterrey, Nuevo Leon.  (*Id.* ¶ 11.)

On April 7, 2010, PEP tried to file its nullity complaint for a second time.  This time PEP filed the complaint in Mexico City before the Fifth Judicial District Court on Civil Matters.  (Tracey Supp. Decl. ¶ 12.)  On April 13, 2010, the court refused to accept the complaint because of procedural defects.  (von Wobeser Decl. ¶¶ 106-107.)  PEP challenged this dismissal in the same court, but its challenge was dismissed on April 15, 2010.  (von Wobeser Decl. ¶¶ 107-109.)  <u>As of the date of this submission, no court has accepted PEP's nullity complaint</u>.  (von Wobeser Decl. ¶ 111.)

### III.   ARGUMENT

#### A.   The Court Has Personal Jurisdiction over PEP

PEP's *only* ground for arguing that the Court lacks personal jurisdiction is that COMMISA has not executed service pursuant to 28 U.S.C. §1608(b) of the Foreign Sovereign Immunities Act ("FSIA").  (PEP Mem. at 4.)  For the reasons set forth in COMMISA's memorandum of law and accompanying exhibits submitted in opposition to PEP's motion to dismiss for insufficient service submitted on April 1, 2010, PEP's personal jurisdiction argument fails because COMMISA has served PEP pursuant to 28 U.S.C. §1608(b).  Accordingly, this Court has personal jurisdiction over PEP.

#### B.   Venue is Appropriate in this Court

PEP's next argument is that this Court is not the proper venue for this proceeding.  (PEP Mem. at 5-6.)  PEP is incorrect.  Under 28 U.S.C. §1391(f)(1), venue is appropriate in any judicial district where "a substantial part of property that is the subject of the action is situated."  Under §1391(f)(3), venue is also appropriate where PEP "is doing business."  As described above in Part II.F., a substantial part of the property that is the subject of this action is situated in

18

New York City and PEP is doing business in New York City.  Noticeably absent from PEP's brief is any argument that it does *not* own property in New York City, or that it is *not* doing business in New York.[4]  (PEP Mem. at 5-6.)  This is because PEP cannot make such an argument.  Accordingly, venue is appropriate in this judicial district.

### C.   The Court is the Proper Forum for this Proceeding

PEP next argues that the court should dismiss this proceeding on the grounds of *forum non conveniens* and that Mexico is the proper forum.  (PEP Mem. at 6-11.)  This court has broad discretion in applying the *forum non conveniens* doctrine.  *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).  In exercising this discretion, courts consider (1) the degree of deference afforded to plaintiff's choice of forum, (2) whether the alternative forum is adequate to adjudicate the parties' dispute, and (3) the balance of the public and private interests implicated in the choice of forum.  *Id.*

PEP's argument fails for two reasons.  First, Mexico is not an adequate alternative forum.  Second, the public and private interest factors weigh in favor of this forum.

### 1.   COMMISA's Choice of Forum is Entitled to Deference

Deference to a foreign plaintiff's choice of a United States forum is measured on a "sliding scale."  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001).  "[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*."  *Id.* at 72.  "[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons -- such as attempts to win a tactical advantage

---

[4]       PEP craftily argues that "PEP is not licensed to do business in New York, and COMMISA does not allege that PEP is doing business in New York." (PEP Mem. at 5-6.)  But PEP never argues that it is not doing business in New York because, in fact, it is.

resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum -- the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion." *Id.* at 72.

COMMISA's choice of forum is entitled to deference. COMMISA is a subsidiary of an American company and much of the project work occurred in the U.S. COMMISA chose this forum because of PEP's substantial assets in and connections to New York. No evidence suggests COMMISA's choice of forum was motivated by forum shopping -- there are no local laws that favor COMMISA's case, this is not a jury trial, and New York is not an inconvenient place for PEP to litigate given its extensive contacts here. Indeed PEP has consented to be sued here in connection with the Bond Offering. As Judge Pauley recently noted, forum shopping for purposes of a recognition proceeding is not a valid consideration because "an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Figueiredo Ferraz Consultoria E Engenharia De Projeto Ltda. v. The Republic of Peru*, 655 F. Supp. 2d 361, 375 (S.D.N.Y. 2009) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).

PEP argues that "COMMISA's attempt to enforce the Arbitral Decision mirrors" petitioner's attempt to do so in *Monegasque De Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002). Petitioner is incorrect. *Monde Re* addressed very different facts than presented here. Unlike PEP here, the respondent in *Monde Re* had no assets in or connections to New York. *Monde Re*, 311 F.3d at 499. In *Monde Re*, petitioner was a Russian company that had no nexus to the United States, whereas here, COMMISA is a

subsidiary of KBR, Inc., a major United States corporation  *Id.*  Further, unlike in *Monde Re*, the project that was the subject of the dispute had extensive United States connections.  *See supra*, Part II, A.   In *Monde Re*, the Second Circuit noted that "the jurisdiction provided by the Convention is the only link between the parties and the United States."  *Monde Re*, 311 F.3d at 499.  That is not the case here, where there are substantial connections to the United States and New York.

2.     Mexico is not an Adequate Alternative Forum

An alternative forum is ordinarily adequate if the defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute.  *Monde Re*, 311 F.3d at 499.  Here, Mexico is not an adequate alternative forum because it does *not* permit litigation of the subject matter of the dispute -- *i.e.*, attachment of PEP's property.  Mexican law "does not allow attachment in aid of execution upon a judgment by Mexican courts upon the assets of Petróleos Mexicanos or the subsidiary entities."  (Ex. 41, Prospectus at 15. *See also id.* at 68 ("attachment in aid of execution and execution of a final judgment may not be ordered by Mexican courts against property" of PEP).)  Proceeding in a Mexican court is not an alternative for COMMISA because Mexican law precludes COMMISA from attaching PEP's assets in Mexico to satisfy the Final Award.  (von Wobeser Decl. ¶¶ 133-156.)  The *Monde Re* court based its holding in part on the fact that Ukrainian law "specifically provides for the execution of judgments against government properties." *Monde Re,* 311 F.3d at 499.  The exact opposite circumstance is present in this case -- Mexican law specifically provides that PEP's property cannot be attached in Mexico.

Further, courts have held that only a United States court "may attach the commercial property of a foreign nation located in the United States."  *Figueiredo*, 655 F. Supp. 2d at 375-76 (citing *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 303 (D.C. Cir. 2005)).  In

*Figueiredo*, Judge Pauley found that Peru was not an adequate alternative forum for recognition and enforcement of a Peruvian arbitral award because Peru could not attach commercial property of Peru located in the United States. *Figueiredo*, 655 F. Supp. 2d at 376.   As in *Figueiredo*, Mexico cannot order the attachment of PEP's property in the United States -- indeed, a Mexican court cannot even order the attachment of PEP's property in Mexico.   Accordingly, Mexico is not an adequate alternative forum.

PEP states that any argument by COMMISA that Mexico is not an adequate forum "would be disingenuous because COMMISA has previously initiated litigation in Mexico." (PEP Mem. at 8.)   But the fact that COMMISA has in the past initiated litigation in Mexico does not render Mexico an adequate forum for this particular proceeding.   As described above, the purpose of the *amparo* was to maintain the status quo while the arbitration was pending.   It says nothing about whether the forum provides an adequate remedy for enforcing a judgment against PEP, nor does it change the fact that Mexican law precludes attachment of PEP's assets.

The only "disingenuous" arguments are those advanced by PEP.   PEP knows that COMMISA cannot enforce the award in Mexico.   Nonetheless, PEP asks this Court to dismiss the case to Mexico knowing that such a dismissal would leave COMMISA with no means to enforce the award.   Mexico is not an adequate alternative forum.

### 3.   The Public and Private Interest Factors Weigh in Favor of this Forum

"A district court is constrained to balance two sets of factors in determining whether there should be an adjudication in a Petitioner's chosen forum or in the alternative forum suggested by the respondent." *Monde Re*, 311 F.3d at 500.   The private interest factors pertain to, *inter alia*, the convenience of the litigants, the relative ease of access to sources of proof, and the availability of compulsory process for attendance of unwilling witnesses. *Id.*   "[T]he court should focus on the precise issues that are likely to be actually tried, taking into consideration the

convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues." *Iragorri*, 274 F.3d at 74.  The public interest factors "include the administrative difficulties associated with court congestion; the imposition of jury duty upon those whose community bears no relationship to the litigation; the local interest in resolving local disputes; and the problems implicated in the application of foreign law." *Monde Re*, 311 F.3d at 500.

"The private interest factors do not weigh in favor of *forum non conveniens* dismissal in a summary proceeding such as" a proceeding to recognize and confirm an arbitral award. *Figueiredo*, 655 F. Supp. 2d at 376.  Indeed, courts in recognition proceedings typically rely upon documents and declarations submitted by the parties in assessing whether to recognize the award.  *Id.*, citing *Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n*, 361 F.3d 676, 685 (2d Cir. 2004).  This proceeding is no exception.  Accordingly, the private interest factors weigh against *forum non conveniens* dismissal.

Similarly, the public interest factors militate against dismissal.  American courts have an interest in enforcing commercial arbitration agreements in international contracts.  *Figueiredo*, 655 F. Supp. 2d at 376, (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)).  In addition, unlike in *Monde Re*, PEP has substantial contacts with this forum and significant assets in this forum.  *Id.*  Also unlike in *Monde Re*, petitioner is a subsidiary of a U.S. corporation, and a substantial portion of the work relating to the project was performed in the United States.  As Judge Pauley noted in *Figueiredo*: "[T]he Republic should not be able to avoid payment of its obligations under the doctrine of *forum non conveniens* where it has entered into the Inter-American Convention and maintains assets in the United States."  *Id.* at 377.  Accordingly, the public interest factors also weigh against *forum non conveniens* dismissal.

### D.   No Ground Exists for Setting Aside the Award

The parties agree that the Panama Convention applies to this recognition proceeding.

Inter-American Convention on International Commercial Arbitration, *opened for signature* Jan. 30, 1975, 104 Stat. 448, 14 I.L.M. 336 (hereinafter "Panama Convention"). (Petition ¶ 5;  PEP Mem. at 11, n.6.)[5]   Under the Panama Convention, "the district court's role in reviewing a foreign arbitral award is strictly limited." *Compagnie Noga D'Importation Et D'exp. S.A. v. Russian Fed'n*, 361 F.3d 676, 683 (2d Cir. 2004)   "'The [r]eviewing court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'"  *Id.* (quoting 9 U.S.C. § 207 (2000)).  The district court's role is "strictly limited" because a recognition proceeding "merely makes what is already a final arbitration award a judgment of the court." *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984).[6]

Article 5 of the Panama Convention sets forth the grounds under which this Court may refuse to recognize the award.  These defenses are construed narrowly. *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 976 (2d Cir. 1974).   PEP has the burden to prove that one of these grounds exist. *See* Panama Convention, Article 5; *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 313 (2d Cir. 1998); *Parsons & Whittemore*, 508 F.2d at 973.  "The burden is a heavy one, as the showing

---

[5]      The United States and Mexico are signatories of both the New York and Panama Convention.  Courts apply uniform standards in recognizing awards under both Conventions, and case law addressing the New York Convention applies to this proceeding. *Productos Mercantiles E Industriales, S.A. v. Faberge USA Inc.*, 23 F.3d 41, 45 (2d Cir. 1994).

[6]      The New York and Panama Conventions were created with the express desire of eliminating the requirement that court challenges must be exhausted before an award is considered final and binding. *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 22 (2d Cir. 1997) ("the Convention intentionally liberalized procedures for enforcing foreign arbitral awards") (internal quotation marks and citation omitted). *See also* Summary Record of the Third Meeting of the United Nations Conference on International Commercial Arbitration, UN Doc. E/CONF.26/SR.37, Holleaux (France) & Haight (ICC) (1958), *available at* www.uncitral.org. *See also* II GARY BORN, INTERNATIONAL COMMERCIAL ARBITRATION,   2819 (2009) (There is "no possibility that the Convention requires that there be confirmation of an award by local courts as a condition for recognition; any such requirement is clearly negated by the Convention's language and drafting history.  In turn, this also strongly suggests that the possibility of ongoing judicial review of an award in the arbitral seat should not prevent the award from being binding (since this would effectively revive the double *exequatur* requirement by preventing an award from being binding until avenues for local judicial review had been exhausted." )).

required to avoid summary confirmation is high." *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009) (internal quotation marks and citation omitted).

PEP argues that three grounds apply: Articles 5(1)(c), (d) and (e).  As set forth below, each of PEP's arguments lack merit.

### 1.   No Basis Exists to Set Aside the Award under Articles 5(1)(c) or (d)

PEP argues that the award should be set aside under Articles 5(1)(c) and (d) for the same reasons: *i.e.*, that the *amparo* proceeding "deprived the arbitral tribunal of jurisdiction already resolved by the Mexican courts," and, in light of how the *amparo* proceeding was resolved, the Final Award "was contrary to Mexican public policy, exceeded the scope of any dispute that could be arbitrated, did not apply Mexican law as required by the Contract, and caused the entire arbitration to contradict the terms of the Contract executed by the Parties."  (PEP Mem. at 12-13.)  PEP's argument fails for the following reasons.

First, PEP's arguments are outside the scope of Articles 5(1)(c) and (d).  Article 5(1)(c) provides that an award may be set aside if the "decision concerns a dispute not envisaged in the agreement between the parties to submit to arbitration."  Panama Convention, Article 5(1)(c). The purpose of this provision is to prevent confirmation of an award where a tribunal decided issues outside the scope of the parties' arbitration agreement or failed to decide issues submitted to them. *See Parsons & Whittemore*, 508 F.2d at 976 (rejecting a party's Article V(1)(c) defense based on damages awarded allegedly in contravention of the agreement); *Fiat S.p.A. v. Ministry of Fin. & Planning of Republic of Surin.*, No. 88 CIV. 6639, 1989 WL 122891, at *5 (S.D.N.Y. Oct. 12, 1989) (holding that the arbitrator "exceeded its authority when it purported to bind a non-signatory who was not expressly covered by the arbitration agreement").  PEP does not argue that the issues addressed by the Tribunal were outside the scope of the arbitration agreement.  Rather, PEP argues that the *amparo* proceeding divested the Tribunal of jurisdiction

to hear such disputes and the Final Award conflicts with the results of the *amparo*. (PEP Mem. at 12-13.) These arguments are beyond the scope of Article 5(1)(c) or any other ground under the Panama Convention.

Article 5(1)(d) provides that an award may be set aside if "the constitution of the arbitral tribunal or the arbitration procedure has not been carried out in accordance with the terms of the agreement signed by the parties." Panama Convention, Article 5(1)(c). The purpose of this provision is to avoid recognizing an award issued by a tribunal that was not constituted in accordance with the parties' agreement or pursuant to a procedure that was not carried out in accordance with their agreement. *See, e.g., Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, No. 90-0169, 1992 WL 122712, at *5–7 (D.D.C. May 29, 1992) (rejecting Article V(1)(d) defense alleging that the arbitrator violated ICC procedure by inserting into the award the amount of the legal costs to be assessed *after* the draft award had been approved by the ICC Court). Here, the Tribunal was selected and the arbitration was conducted pursuant to the parties' agreement and the ICC Rules as designated by the parties. PEP does not argue otherwise. Nor does the dissenting opinion in the Final Award raise any procedural deficiencies. PEP's arguments fall far beyond the scope of Article 5(1)(d) or any other ground in the Panama Convention. *See Gemini Consulting Group Inc. v. Horan Keogan Ryan Ltd.*, No. 06 C 3032, 2007 U.S. Dist. LEXIS 39509, at *22 (N.D. Ill. May 30, 2007) ("Gemini's objection does not fit within the terms of Article V(1)(d), which allows for non-recognition only if there is a deficiency in the arbitral composition or procedure.").

The second reason why PEP's arguments fail is that the parties agreed to and submitted to the Tribunal the exact same issues concerning the scope of arbitration, jurisdiction and the effects, if any, of the *amparo* proceeding upon the arbitration. Both parties submitted extensive

expert testimony on these issues during the arbitration.  (Ex. 37, Final Award at 14-57.)  The Tribunal had the authority to resolve these issues and neither PEP nor the dissent argues otherwise.  *See* ICC Rule 6.2. (*See also* Marooney Aff., Ex. 43, Terms of Reference at 6 (executed by PEP and COMMISA); Marooney Aff., Ex. 44, Procedural Order No. 1, December 13, 2005.)  The Tribunal diligently considered the issues and resolved them in COMMISA's favor.  Accordingly, PEP cannot now claim that they were outside the scope of the Tribunal's jurisdiction or otherwise ask this Court to relitigate the same issues.  *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2nd Cir. 2005) (arbitration tribunal is the proper authority to decide issues of jurisdiction and scope where arbitration rules authorize tribunal to address such issues); *In Re Arbitration Between Halcot Navigation Ltd. P'ship & Stolt-Nielsen Transp. Group*, 491 F. Supp. 2d 413, 420 (S.D.N.Y. 2007) ("As Halcot requested a determination and briefed the issue of arbitrarily to the arbitrators, it cannot claim that the issue decided falls outside the scope of submission.").

Third, as described in detail in the Interim Award, the Final Award and in the accompanying declaration of Dr. von Wobeser, PEP's arguments concerning the *amparo* proceeding are without merit.  The *amparo* proceeding was filed after the arbitration was commenced but before the Tribunal was constituted to preserve the status quo and to prevent PEP from wrongfully collecting $80 million by cashing in the performance bonds.  (von Wobeser Decl. ¶ 44.)  The *amparo* is limited in scope and distinct from the arbitration.  (von Wobeser Decl. ¶¶ 31-34.)  The *amparo* addressed only constitutional issues relating to PEP's rescission of the contract.  (von Wobeser Decl. ¶ 34.)  The proceeding did not and could not address the merits of the parties' contractual disputes.  (von Wobeser Decl. ¶¶ 33, 49.)  Indeed, in resolving the *amparo*, the Mexican Supreme Court found that a unilateral rescission by a

governmental agency did not deny a contracting party due process because a contractor like *COMMISA had the right to have the financial impacts of the rescission decided in a different proceeding*, which is precisely what COMMISA did in the ICC arbitration. (Ex. 37, Final Award at 297; von Wobeser Decl. ¶ 53.) Additionally, when PEP rescinded the contract it issued a *finiquito* on April 3, 2007 which sets forth PEP's contentions as to what each party owes and its positions on any claims asserted. PEP admitted that the finiquito was subject to arbitration under the parties' agreements. (von Wobeser Decl. ¶ 55.)

The Interim and Final Awards thoroughly and fully address these points. PEP never challenged the Interim Award and has waived its right to do so. (von Wobeser Decl. ¶ 39.) The Interim and Final Award are entirely consistent with Mexican law and public policy. (von Wobeser Decl. ¶ 28.) The arguments raised by PEP now are the same ones already raised and rejected by the Tribunal. These arguments have no merit for all the reasons set forth in the Interim Award, Final Award and the accompanying declaration of Dr. von Wobeser.

2.    No Basis Exists to Set Aside the Award under Article 5(1)(e)

PEP argues that the Final Award is "not binding pending review by the Mexican courts" and that the Award should not be recognized pursuant to Article 5(1)(e). (PEP Mem. at 13.) PEP cites no authority that supports its position and is once again incorrect.

The Final Award is binding upon the parties for three independent reasons. First, the parties agreed to settle all of their disputes "definitively" through arbitration. (Ex. 11, EPC-1 Contract at 23.3; Ex. 12, Convenio C at 19.) Having agreed to resolve their disputes "definitively" through arbitration, the resulting arbitration award is final and binding. *See Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, No. 02 Civ. 467, 2003 U.S. Dist. LEXIS 8169, at *5-6 (S.D.N.Y. May 12, 2003) (where parties agreed to arbitration as the final resolution of their disputes, the award was binding under the Panama Convention). "The fact

that recourse may be had to a court of law does not prevent the award from being 'binding.'" *Ukrvneshprom State Foreign Econ. Enter. v. Tradeway, Inc.*, No. 95 Civ. 102, 1996 U.S. Dist. LEXIS 2827, at *12 (S.D.N.Y. Mar. 11, 1996) (internal quotation marks and citations omitted). Indeed, courts confirm arbitral awards while nullity proceedings are ongoing.  *See, e.g., China Nat'l Chartering Corp. v. Pactrans Air & Sea, Inc.*, No. 06 Civ. 13107, 2009 U.S. Dist. LEXIS 106074, at *5 (S.D.N.Y. Nov. 13, 2009); *In Re Arbitration Between Interdigital Commc'ns Corp. & Samsung Elecs. Co.*, 528 F. Supp. 2d 340, 361 (S.D.N.Y. 2007); *Banco de Seguros*, 2003 U.S. Dist. LEXIS 8169, at *5-6; *MGM Prods. Group, Inc. v. Aeroflot Russian Airlines*, 573 F. Supp. 2d 772, 777 (S.D.N.Y. 2003), aff'd 91 Fed. Appx. 716 (2d Cir. 2004).

Second, the parties agreed to arbitrate pursuant to the ICC rules.  Article 28(6) of the ICC expressly provides:

> Every Award shall be binding on the parties.  By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

ICC Article 28(6).

Third, the award is considered final and binding under Mexican law.  (von Wobeser Decl. ¶¶ 10-24.)  The fact that a nullity procedure may have been commenced "does not deprive the award of its final and binding nature." (*Id.* ¶ 22.)  Similarly, the fact that PEP's arbitrator dissented does not effect the binding nature of the award.  (von Woebster Decl. ¶¶ 86-93.) Indeed, there are three arbitrators instead of two precisely for this reason: that the parties can obtain a binding award even if one arbitrator disagrees.

**E.**     **The Court Should not Stay this Proceeding**

"A stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration." *Europcar Italia, S.p.A. v. Maiellano Tours Inc.*, 156 F.3d 310,

317 (2d Cir. 1998).  In assessing whether a stay is appropriate, this Court considers the factors

set forth by the Second Circuit in *Europcar*.  Respondent provided an incomplete and inaccurate

description of the *Europcar* factors.  (PEP Mem. at 13.)  The actual *Europcar* factors are:

> (1) the general objectives of arbitration--the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;

> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;

> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;

> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

> (5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive "suitable security" and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country, and

> (6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

*Europcar*, 156 F.3d at 317-18 (citation omitted).  "Because the primary goal of the Convention is

to facilitate the recognition and enforcement of arbitral awards, the first and second factors on

the list should weigh more heavily in the district court's determination."  *Id.* at 318.  Under these

factors, the Court should not stay the recognition proceedings, but rather recognize the arbitral

award immediately.

    Under the first factor, the objectives of arbitration, including "the expeditious resolution

of disputes and the avoidance of protracted and expensive litigation," overwhelmingly favor

confirmation of the award. *Europcar*, 156 F.3d at 317. The parties expressly agreed to resolve "definitely" through ICC arbitration their disputes under the contracts. (Ex. 11, EPC-1 Contract at 23.3; Ex. 12, Convenio C at 19.) After disputes arose, COMMISA commenced this arbitration in 2004. (Pet. ¶ 14.) After years of settlement negotiations and then five years of arbitration COMMISA finally obtained an award from the Arbitration Tribunal on December 16, 2009. (Pet. ¶ 19.) In effect, PEP has avoided paying COMMISA hundreds of millions of dollars owed to COMMISA for more than six years. This dispute must come to expeditious resolution and should not be bogged down by many more years of protracted litigation in Mexico. *Interdigital Commc'ns Corp.*, 528 F. Supp. 2d at 361 ("the expeditious resolution of disputes and the avoidance of protracted and expensive litigation -- overwhelmingly favor enforcement of the Award at this time, after the parties have devoted years of effort to litigating their dispute before the Panel and this Court. Indeed, it is beyond doubt that adjourning enforcement of the Award while this Court awaits the conclusion of what is likely to be yet another protracted and fiercely contested arbitration proceeding would seriously undermine these objectives.") (internal quotation marks and citations omitted).

The second factor -- *i.e.*, "the status of the foreign proceedings and the estimated time for those proceedings to be resolved" -- also weighs heavily in favor of confirmation of the Award. The Mexican nullification proceedings have not even begun because both courts in which PEP attempted to file its nullification complaint rejected PEP's complaint. Even assuming PEP eventually succeeds in filing a nullification complaint in a Mexican court, the nullification proceeding is likely to last between two to six years. (von Woebster Decl. ¶ 120.) *See China Nat'l Chartering Corp.*, 2009 U.S. Dist. LEXIS 106074, at *4 (refusing to stay and enforcing where the respondents' "appeal appears to be in its relatively early stages. While it has filed a

petition, there is no evidence that any other action has been taken."); *Interdigital Commc'ns Corp.,* 528 F. Supp. 2d at 361 (refusing to grant a stay in part because the foreign litigation to vacate the award was in its infancy and would take a long time to resolve).

The third factor, "whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review," also weighs in favor of confirming the award and not granting a stay. As of the date of this submission, a nullity proceeding has not been properly filed. Assuming one is properly filed, the award is final and binding in Mexico and the grounds for setting aside an award under Mexican law are practically identical to the grounds set forth in the Panama Convention. (von Wobeser Decl. ¶¶ 25-27.) No ICC award has been set aside by Mexico's courts. (von Wobeser Decl. ¶ 26.)

Under the fourth factor, the "characteristics" of the Mexican action also weigh in favor of enforcement. COMMISA did not commence proceedings in Mexico. Rather, PEP has attempted (albeit unsuccessfully) to commence the Mexican nullity proceeding. The nullity proceeding is one to "set the award aside," a factor that "weigh[s] in favor of enforcement." *Europcar,* 156 F.3d at 318; *Interdigital Commc'ns Corp.,* 528 F. Supp. 2d at 361 ("the relevant characteristics of the Samsung III Arbitration strongly weigh in favor of enforcement because the arbitration was initiated (i) with the express goal of 'supersed[ing]' and/or 'render[ing] moot' the findings in the Award (see Samsung's Opp. Br. at 23)"); *MGM Prods. Group, Inc.,* 573 F. Supp. 2d at 778 (finding that the fact that the foreign proceeding was an effort to overturn the award and not confirm it weighed in favor of enforcement). The nullification proceedings are simply an attempt to "hinder or delay resolution of the dispute." *Europcar,* 156 F.3d at 318.

Further, COMMISA filed this action first on January 11, 2010 -- almost three months before PEP even attempted to commence a nullity proceeding in Mexico. International comity

concerns are not implicated because the instant action was filed well before the nullification proceeding in Mexico and PEP -- not COMMISA -- attempted to initiate the Mexican proceeding.[7]  *Europcar*, 156 F.3d at 317.  Courts have held that where the U.S. enforcement action was the first filed, the court should enforce the award.  *Interdigital Commc'ns Corp.*, 528 F. Supp. 2d at 361 (refusing to stay where New York action was first in time).

Finally, under the fifth factor, the balance of the hardships weigh in favor of confirming the award.  Over five years have passed since the parties first filed the arbitration.  PEP owes COMMISA hundreds of millions of dollars for work performed by COMMISA as early as 2002.  (Ex. 37, Final Award at 732-33.)  Under these circumstances, the balance of the hardships favors COMMISA.  *MGM Prods. Group, Inc.*, 573 F. Supp. 2d at 778 ("The Court also believes that the balance of the hardships of a stay is greater on MGM, assignee of Russo, the party that provided services without receiving payment, than upon Aeroflot, the party that received services without paying for them.")

**F.     This Court Should Confirm the Arbitral Award**

"An arbitration award that is not vacated or modified may be confirmed by a court."  *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 257 F. Supp. 2d 681, 685 (S.D.N.Y. 2003).  As set forth above, no basis exists for dismissing the Petition or for not recognizing the Final Award pursuant to the Inter-American Convention.  For all of the reasons set forth in the Petition and as described herein, the Court should grant COMMISA's cross-motion to confirm the arbitral award.

---

[7]      Because the respondent initiated the parallel Mexican proceedings, "'the possibility of conflicting results' cannot be laid at 'the [petitioner's] door.'"  *Interdigital Communs. Corp.*, 528 F. Supp. 2d at 361 n.12 (*quoting Europcar*, 156 F.3d at 317).

## IV.    CONCLUSION

For the reasons set forth herein and in COMMISA's opposition to PEP's motion to dismiss for insufficient service, the Court should deny PEP's motion to dismiss the Petition and should grant COMMISA's cross-motion to confirm the Final Award.    COMMISA has been trying to recover the hundreds of millions of dollars owed to it by PEP since 2002.    PEP should not be allowed to delay further its payment of monies owed to COMMISA.    The policies behind the Panama Convention and New York Convention, the parties' agreement to resolve their disputes definitively through binding international arbitration, as well as fundamental fairness and equity, require immediate confirmation of the arbitral award.

Dated: April 22, 2010
          New York, New York

                                        KING & SPALDING LLP

                                        By: _____
                                        Richard T. Marooney
                                        Kana A. Ellis
                                        King & Spalding, LLP
                                        1185 Avenue of the Americas
                                        New York, NY 10036
                                        Tel: 212-556-2100
                                        Fax: 212-556-2222

                                        *Attorneys for Petitioner*
                                        CORPORACIÓN MEXICANA DE
                                        MANTENIMIENTO INTEGRAL,
                                        S. DE R.L. DE C.V.
                                        Charles C. Correll
                                        101 2nd Street
                                        San Francisco, CA 94105-3664
                                        Tel: 415-318-1200
                                        Fax: 415-318-1300
                                        *Attorneys for Petitioner*
                                        CORPORACIÓN MEXICANA DE
                                        MANTENIMIENTO INTEGRAL,
                                        S. DE R.L. DE C.V.