USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/27/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                   :

CORPORACIÓN MEXICANA DE        :
MANTENIMIENTO INTEGRAL, S. DE R.L. DE  :
C.V.,                   :

            Petitioner,     :

    -against-              :

PEMEX-EXPLORACIÓN Y PRODUCCIÓN,   :

           Respondent.   :

------------------------------------------------------------- x

**OPINION AND ORDER
GRANTING PETITIONER'S
MOTION TO CONFIRM
ARBITRATION AWARD AND
DENYING RESPONDENT'S
MOTION TO DISMISS PETITION**

10 Civ. 206 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

## I. INTRODUCTION

Generally, arbitration awards issued in one nation can be enforced by judgments and executions granted by the courts of another nation. However, arbitration awards also can be nullified, and if nullified by the courts of the nation in which, or according to the law of which, the arbitration was conducted, a conflict is created for the courts of other nations. Which is to be given primacy, the award or the nullifying judgment?

This is the issue of the case. After a vigorously contested arbitration, a panel of arbitrators in Mexico City issued an award (the "Award") in favor of petitioner, Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("COMMISA"). The Award, with interest, is now worth almost four hundred million U.S. dollars. COMMISA obtained judgment in this court confirming the Award. Respondent, PEMEX-Exploración y Producción (PEP), an instrumentality of Mexico, continued to resist, appealing from the judgment to the Second Circuit of Appeals, and filing litigation proceedings in the Mexican courts to nullify the Award.

1

PEP was successful in the Mexican courts. On September 21, 2011, the Eleventh Collegiate Court on Civil Matters of the Federal District (the "Eleventh Collegiate Court," generally equivalent in hierarchy and authority to the U.S. Court of Appeals for the D.C. Circuit) issued a 486-page decision that held that the Award was invalid. It reversed the Mexican district court, and remanded the case to it to issue a judgment in favor of PEP. On October 25, 2011, the district court issued such a judgment with its own 46-page opinion.

The Eleventh Collegiate Court held that arbitrators are not competent to hear and decide cases brought against the sovereign, or an instrumentality of the sovereign, and that proper recourse of an aggrieved commercial party is in the Mexican district court for administrative matters. Hence, it nullified the Award. The court based its decision in part on a statute that was not in existence at the time the parties' entered their contract, and the decision left COMMISA without the apparent ability to obtain a hearing on the merits of its case.

In response to that decision and its finality, the Second Circuit Court of Appeals remanded the case to me to address the effect that the decree of nullification should have on the Award and on my judgment confirming the Award. Following remand, I received further briefing from the parties, heard arguments on the complex issues that were presented, and conducted a three-day trial of the parties' experts on Mexican law. This decision reflects my findings and conclusions.

I hold, for the reasons discussed below, that the Eleventh Collegiate Court decision violated basic notions of justice in that it applied a law that was not in existence at the time the parties' contract was formed and left COMMISA without an apparent ability to litigate its claims. I therefore decline to defer to the Eleventh Collegiate Court's ruling, and I again confirm the Award and grant judgment thereon.

2

## II. FACTUAL AND PROCEDURAL BACKGROUND

### a. The Parties and Their Agreements

Under the Political Constitution of the United Mexican States, all petroleum and hydrocarbons in Mexico belong to the state. State-owned Petróleos Mexicanos ("PEMEX") controls and manages those resources. PEP, based in Mexico City, is the PEMEX subsidiary responsible for oil and natural gas exploration and production. COMMISA, a Mexican corporation, is a subsidiary of KBR, Inc., a construction company and military contractor incorporated in Delaware and headquartered in Houston, Texas.

In October 1997, PEP and COMMISA entered into a contract (the "October 1997 Contract") for COMMISA to build and install two offshore natural gas platforms in the Bay of Campeche, in the southerly part of the Gulf of Mexico. Among other provisions, the October 1997 Contract includes: (i) a clause providing that the contract is governed by Mexican law; [1] (ii) a clause providing for any dispute to be settled through arbitration conducted in Mexico City in accordance with the Conciliation and Arbitration Regulations of the International Chamber of Commerce ("ICC");[2] (iii) a clause allowing PEP to rescind the contract (i.e., issue an administrative rescission) if COMMISA failed to comply with certain obligations under the contract;[3] and (iv) a clause requiring COMMISA to obtain a performance bond guaranteeing its contractual obligations.[4]

---

[1] "The Contract shall be governed in accordance with the federal laws of the United Mexican States." Ex. 2 § 23.1.

[2] "Any controversy, claim, difference, or dispute that may arise from or that is related to, or associated with, the present Contract or any instance of breach with the present Contract, shall be definitely settled through arbitration conducted in Mexico City, D.F., in accordance with the Conciliation and Arbitration Regulations of the International Chamber of Commerce that are in effect at that time. The arbitrators shall be three in number, and the language in which the arbitration shall be conducted shall be Spanish." Id. at § 23.3.

[3] "In the event that the Contractor finds itself in one or more of the grounds described in Clause 10.3.2 and clause 10.3.3., or in general fails to comply with the provisions, guidelines, bases, procedures, and requirements established by the Law of Acquisitions and Public Works and other applicable legal provisions, PEP may rescind the present contract administratively, in whole or in part, in accordance with the terms set forth in the above mentioned clauses." Id. at § 10.3. Clause 10.3.2. identifies "Instances of Partial Administrative Rescission," including, for

3

In May 2003, PEP and COMMISA entered into a related contract (the "May 2003 Contract" and together with the October 1997 Contract, the "Contracts"). Like the October 1997 Contract, the May 2003 Contract is governed by Mexican law and provides for both arbitration and administrative rescission by PEP. Ex. 4 at §§ 9.2, 19.1, 19.3.

The parties' arbitration agreement was made pursuant to the PEMEX enabling statute, which also applied to PEP as a subsidiary of PEMEX. The Organic Law by which PEMEX was organized as a wholly-owned, government entity, contemplated the possibility of arbitration. Section 14 of the PEMEX and Affiliates Organic Law provides: "In the event of international legal acts, Petróleos Mexicanos or its Affiliates may agree upon the application of foreign law, the jurisdiction of foreign courts in trade matters, and execute arbitration agreements whenever deemed appropriate in furtherance of their purpose." Ex. MMM at 443. The PEMEX law was passed following the enactment, in 1994, of the North American Free Trade Agreement ("NAFTA"), which sought to encourage investment in Mexico by providing for the arbitration of international disputes. See Evidentiary Hearing Tr. 39:4-25; North American Free Trade Agreement, U.S.-Can.-Mex., Dec. 17, 1992, 32 I.L.M. 289 (1993), art. 1115, 2022.

### b. COMMISA's Judicial Challenge to PEP's Administrative Rescission

On March 29, 2004, after each party charged the other with breaching contractual obligations, PEP notified COMMISA that it intended to administratively rescind the Contracts. However, before doing so, PEP and COMMISA engaged in conciliation efforts, attempting to resolve their disputes amicably. On December 1, 2004, conciliation having failed, COMMISA

---

example, "[i]f the Contractor unjustifiably suspends the Works or refuses to replace any part thereof which has been rejected by PEP," or "[i]f the Contractor partially abandons the Works." Clause 10.3.3. identifies "Instances of Total Administrative Rescission," including, for example, "[i]f the Contractor fails to begin the Works . . . on the date stipulated," or "[i]f the Contractor abandons the [Works]."

[4] "In order to guarantee the fulfillment of its obligations arising from this present Contract, the Contractor shall obtain and provide to PEP . . . a bond policy in an amount equal to 10% . . . of the total amount of the Contract." Id. at § 7.1.

4

filed a demand for arbitration with the ICC. Two weeks later, on December 16, 2004, PEP gave COMMISA notice that it was proceeding by administrative rescission.

COMMISA responded by filing a petition for an indirect amparo[5] with the Fourteenth District Court on Administrative Matters for the Federal District ("Fourteenth District Court") on December 23, 2004.[6] COMMISA alleged that PEP's administrative rescission was untimely and that the statutes on which it was based were unconstitutional and inapplicable to the parties' dispute. The Fourteenth District Court held that the administration rescission by PEP was not an act of public authority and thus an amparo was not the proper procedure to challenge the rescission and, on August 23, 2005, dismissed COMMISA's petition.

COMMISA appealed the district court's decision to the Sixth Collegiate Court on Administrative Matters of the First Circuit ("Sixth Collegiate Court"). The Sixth Collegiate Court reversed on May 17, 2006, holding that PEP's administrative rescission was an act of public authority, and that an amparo proceeding was a proper way to challenge it. The Sixth Collegiate Court referred the issue of the administrative rescission statutes' constitutionality to the Mexican Supreme Court, the highest court in Mexico.

On June 23, 2006, the Mexican Supreme Court held that the administrative rescission statutes were constitutional. The court ruled that state agencies had a "special privilege" to promote the public good, and that administrative rescissions fell within this

---

[5] An amparo is a remedy without a common law equivalent. Bruce Zagaris, The Amparo Process in Mexico 6 U.S.-Mex. L.J. 61, 61 (1998). An amparo action is a judicial challenge to the validity or constitutionality of acts of a government authority. See Michael Taylor, Why Do Rule of Law in Mexico? Explaining the Weakness of Mexico's Judicial Branch, 27 N.M. L. Rev. 141, 151 (1997). Damages are not awarded. The sole remedy is a declaration that the challenged government action is invalid. See April 22, 2010 Declaration of Dr. Claus Werner Von Wobeser Hoepfner at 29-30. An indirect amparo is initiated in a district court; a direct amparo is initiated in an appellate court. Zagaris, 6 U.S.-Mex. L.J. at 61.

[6] The district courts of the United Mexican States, like the U.S. district courts, are the trial courts. There are four categories of district courts in Mexico: civil, criminal, administrative, and labor. As in the United States, the district judges hear cases individually, while the appeals courts, known as the collegiate courts, typically sit in three-judge panels. See Evidentiary Hearing Tr. at 185:2-24.

privilege. Ex. LLL at 58-60. Administrative rescission did not violate the Mexican Constitution's guarantee of right of access to the courts because "there is no obstacle or restriction whatever against a private party . . . [filing] within the relevant time periods . . . an administrative dispute proceeding, thereby triggering intervention by the relevant court, if [the aggrieved party] . . . has been adversely affected by the cancellation of the administrative contract for public works to which it was a party." Id. at 71. Pursuant to Article 52(I) of the Organic Law of the Judiciary, the Supreme Court held, the federal district courts for administrative matters (the "District Courts for Administrative Matters") had jurisdiction to hear and resolve contractual disputes arising from administrative rescissions. The Supreme Court did not discuss whether arbitrators could hear issues of administrative rescission if the parties' contracts provided that all disputes arising from the contract should be resolved by arbitration.

The Mexican Supreme Court remanded the case to the Sixth Collegiate Court to consider COMMISA's non-constitutional claims that the administrative rescission statutes were inapplicable and that the administrative rescission was untimely. On February 23, 2007, the Sixth Collegiate Court held that PEP had properly followed the administrative rescission statutes and that the rescission was timely. The court dismissed COMMISA's petition for an amparo against PEP's issuance of an administrative rescission.

Thus, under Mexican law, a state instrumentality like PEP could respond to a contract dispute by issuing an administrative rescission of the contract. The private party could then litigate the contract issues in the appropriate Mexican district court. However, the Mexican courts did not rule on the issue of arbitrability. What would be the implications of an agreement between a government-owned party and a private party to arbitrate all of their disputes including, presumably, a dispute involving not only the conduct claimed to constitute the breach of

6

contract, but also the action of the government-owned party to rescind the contract? That issue was left for future resolution by the arbitrators and by the Mexican courts.

### c. The Initiation of Arbitration and the Challenge to Its Jurisdiction

While the amparo proceedings unfolded, the ICC Tribunal was formed pursuant to COMMISA's demand for arbitration issued December 1, 2004. PEP promptly attacked the arbitrators' jurisdiction, arguing that (i) the arbitration clause was not worded broadly enough to cover the specific dispute at issue, (ii) that COMMISA had not properly exhausted alternative remedies prior to seeking arbitration, and (iii) that COMMISA had waived its right to arbitration by pursuing remedies in the courts. Notably, PEP did not argue at the time that arbitration was an improper forum for deciding disputes related to administrative rescissions. See Ex. 87 at 12-16. On November 20, 2006, the ICC Tribunal issued a unanimous award (the "Preliminary Award") holding that PEP's arguments lacked merit and that the arbitration panel had jurisdiction over all the issues in dispute. Id. at 81.

Following the Preliminary Award, PEP moved for reconsideration, arguing again that the arbitration panel lacked jurisdiction. PEP contended in a March 28, 2007 filing that the recent decisions of the Mexican Supreme Court and the Sixth Collegiate Court deprived the panel of jurisdiction. PEP argued, since the administrative rescission had been held proper by the Mexican courts, the doctrine of res judicata barred the panel from hearing the parties' dispute. The panel denied PEP's motion, ruling, in a May 18, 2007 order, that it retained jurisdiction to hear the merits of the dispute, subject to a final resolution of the issue in the final award. Ex. 116; Ex. 1A at 18.

On October 8, 2007, PEP again filed a motion with the arbitration panel, arguing once more that res judicata barred the action and that COMMISA had waived its right to

7

arbitration by filing the amparo proceeding in the Mexican courts. PEP now added an additional argument: that the administrative rescission was an "act of authority" and could not be arbitrated "since these matters are not subject to arbitration." Ex. 117 at 2. The panel disagreed and, on November 12, 2007, issued an order reaffirming its earlier decision that it could hear the merits, subject to a ruling on the issue of jurisdiction in its final award.

PEP, noting its objection, continued to participate in the arbitration proceedings. PEP did not seek to appeal the Preliminary Award or the subsequent rulings of the arbitration panel, even though PEP had the right to do so under Article 1432 of Mexico's Commercial Code.[7]

### d. Changes in Mexican Law Relating to Public Authorities

As the arbitration between COMMISA and PEP proceeded, Mexican law changed in material ways. Under a statute that took effect December 7, 2007, litigation relating to issues of compliance with the requirements of public contracts was to be litigated in a special administrative court that was established to hear tax and financial matters. Article 14(VII) of the Organic Law of the Federal Court in Tax and Administrative Matters ("Article 14(VII)") provided:

> The Federal Tax and Administrative Justice Court shall hear cases that are brought against the final decisions, administrative acts, and procedures . . . that are handed down in administrative matters on the interpretation of and compliance with contracts for public works, acquisitions, leases and services entered into by the departments and entities of the Federal Public Administration.[8]

---

[7] Article 1432 provides: "If prior to the issuance of its final award the [arbitration] tribunal declares itself competent, either party may petition a judge to review the foregoing within thirty days after receiving notice of the declaration, and his decision shall be non-appealable." See Ex. 85.

[8] PEP disputes this translation, which was provided by COMMISA. According to PEP, the statute refers to decisions and administrative acts that "are to be handed down" instead of decisions and acts that "are handed down." See Evidentiary Hearing Tr. at 345:14-16. PEP argues that the statute was written to refer to future decisions and actions, not actions that occurred in the past, and therefore does not apply to PEP's 2004 administrative rescission. I am not competent to decide between these competing translations, and my decision does not depend on a choice between them.

Ex. 131.

Cases complaining of administrative rescissions now would be litigated in the Federal Tax and Administrative Justice Court (the "Tax and Administrative Court"), a department of the Executive. In the District Courts for Administrative Matters, where matters of administrative rescissions had been litigated, the 10-year statute of limitations applicable to breach of contract actions applied. In the Tax and Administrative Court, in contrast, a 45-day statute of limitations governed. Moreover, the Supreme Court of Mexico held, in a decision that was issued in March 2010,[9] that Article 14(VII) mandated that the Tax and Administrative Court was the exclusive forum to hear disputes concerning administrative rescissions. See Ex. 120 at 10-13.

A second statutory change addressed the arbitrability of administrative rescissions. Section 98 of the Law of Public Works and Related Services ("Section 98"), effective May 28, 2009, provided that although government contractual disputes generally could be arbitrated, "[t]he administrative rescission, early termination of the contracts and such cases as the Regulation of this Law may determine may not be subject to arbitration proceedings." Ex MMM at 427. The law thus required that all cases that challenged administrative rescissions that occurred after May 28, 2009 could not be arbitrated. The law, however, did not address whether it applied to administrative rescissions that were issued prior to its enactment.

### e.  The Arbitration Decision in Favor of COMMISA

Meanwhile, the arbitration proceedings progressed. The parties submitted extensive briefing to the arbitrators on the merits of their claims and, at a hearing in Mexico City from November 27, 2007 to December 5, 2007, presented evidence and witnesses. On

---

[9] The copy of the decision provided by the parties does not indicate on which day of the month the decision was issued.

December 16, 2009, the ICC Tribunal, by a vote of two to one, issued its Award. The majority first reaffirmed that it had jurisdiction over the case. The majority held that res judicata was not a bar to the claim, since the courts in COMMISA's amparo action addressed "completely different claims and causes of action" than those presented in arbitration. Ex. 1A at 43. In the amparo action, COMMISA argued that the government had violated its constitutional rights, but in the arbitration, COMMISA sought contract damages. The panel also found that Section 98 did not apply to the case because Section 14 of the PEMEX Law expressly authorized PEP to enter into arbitrations. Id. at 35. On the merits, the majority found for COMMISA on most counts, although it granted some of PEP's counterclaims. The majority awarded COMMISA $286,101,437.17, plus 34,459,557.58 Mexican pesos (approximately $3 million), interest, and $7,544.536.39 in fees and expenses.[10]

The dissenting arbitrator expressed the belief that res judicata barred the action because COMMISA sought "to achieve the same result" in its amparo action as in the arbitration. Ex. 3 at 164. The dissenting arbitrator contended that Section 98 was an additional bar to the action. Even without that statute, the panel still lacked jurisdiction because the administration rescission was an "act of authority," and such acts could not be arbitrated. Id. at 101, 107.

### f. Confirmation Proceedings in the U.S. District Court

With its arbitration award in hand, COMMISA filed its petition to confirm the Award in this Court on January 11, 2010. On April 5, 2010, PEP moved to dismiss the petition or, alternatively, for a stay pending resolution of its efforts to nullify the Award in Mexico. I held oral argument on the petition on August 25, 2010. At argument, I ruled that PEP had sufficient contacts with New York to be subject to jurisdiction in the Southern District of New

---

[10] At the time of this court's judgment, filed November 2, 2010, PEP's judgment debt to COMMISA was $355,864,541.75.

York and that the case should not be dismissed for forum non conveniens or stayed in light of the proceedings in the Mexican courts. I granted COMMISA's petition to confirm the Award, and judgment was entered on November 2, 2010. PEP appealed, and I granted PEP's motion to stay enforcement pending appeal upon PEP's deposit of an agreed amount of $395,009,641.34 into the Court Registry Investment Account to secure the judgment.

### g. PEP's Litigation in Mexican Courts to Nullify the Award

Concurrently with the litigation initiated by COMMISA in the Southern District of New York, PEP filed suit in the Mexican courts, seeking to nullify the Award against it. Initially, on March 24, 2010, it filed suit in the Third Judicial District Court on Civil and Labor Matters for the State of Nuevo Leon, the State where COMMISA is incorporated. PEP alleged, pursuant to Article 1457 of the Mexican Commercial Code, that the dispute between it and COMMISA was not arbitrable, and that the Award conflicted with Mexican public policy, two of the grounds of nullification provided by Article 1457.[11] The Mexican District Court dismissed the action on March 30, 2010, holding that PEP had to proceed in the district where the arbitration took place, Mexico City. See Ex. S.

PEP re-filed its suit on April 7, 2010, in the Fifth District Court on Civil Matters for the Federal District ("Fifth District Court") in Mexico City.[12] That action was also dismissed on June 25, 2010, partially on substantive grounds. The Fifth District Court held that PEP had waived its argument of non-arbitrability by failing to object timely to the panel's Preliminary

---

[11] Article 1457 provides: "Arbitral awards may only be annulled by a competent judge when: (I) The party bringing the action demonstrates that: a) One of the parties to the arbitration agreement was affected by an incapacity, or that such agreement is not valid by reason of the law to which the parties submitted it, or if nothing was indicated in such respect, by reason of Mexican law; b) It was not notified of the appointment of an arbitrator or of the arbitration proceedings, or was not able, by any reason whatsoever, to exercise his rights; c) The award refers to a controversy which was not foreseen in the arbitration agreement, or contains determinations that exceed its scope . . . or d) The composition of the arbitral panel or the arbitration procedure were not provided for in the arbitration agreement . . . or (II) The Judge determines that, pursuant to Mexican law, the matter of the controversy is not subject to arbitration, or that the award is contrary to public policy." See Ex. M.

[12] The Distrito Federal, or Federal District, is coterminous, generally, with Mexico City.

11

.

Award in favor of its jurisdiction, as Article 1432 of Mexico's Commercial Code allowed it to do.[13]  As an alternative ground of dismissal, the Fifth District Court held that the Award did not violate public policy; it "in no way affect[ed] public peace or the interests and principles governing the national community," but involved only "individual interests arising from a commercial relationship existing between the parties." Ex. 80 at 21.

PEP then filed a petition for an indirect amparo in the Tenth District Court on Civil Matters in the Federal District ("Tenth District Court") to challenge the decision of the Fifth District Court.[14]  Again, PEP failed.  On October 27, 2010, the Tenth District Court dismissed PEP's action.  The Tenth District Court agreed with the Fifth District Court that the parties' contractual agreement had a broad arbitration clause that covered all claims of damages arising from both the breach of contract and from the administrative rescission.  The Tenth District Court ruled that the organic law that established PEMEX authorized it and its subsidiaries (including PEP) to arbitrate its disputes, and "an Arbitral Tribunal indeed has powers to address the grounds, context and contract effects of a rescission for they are private in nature." Ex. 56 at 29.

PEP appealed to the Eleventh Collegiate Court for the Federal District.  This time it succeeded.  On August 25, 2011, a three-judge panel of the Eleventh Collegiate Court reversed, and ordered amparo relief in favor of PEP.  Its 486-page opinion, issued September 21, 2011, held that public policy was implicated because administrative rescissions are "issued to safeguard financial resources" of the state.  Ex. MMM at 422.[15]  Arbitrations, the Eleventh

---

[13] See supra note 7.

[14] Since PEP, under Mexican law, could not appeal the Fifth District's decision, PEP proceeded by indirect amparo. See April 5, 2010 Declaration of Carlos Sánchez-Mejorada y Velasco at 5. See also Bruce Zagaris, The Amparo Process in Mexico 6 U.S.-Mex. L.J. 61, 61 (1998).

[15] Although the opinion was 486 pages, most of the decision was an extensive recitation of the parties' positions and the legal history of the case.  The court explained its rationale in the final 80 pages of the decision.

Collegiate Court held, were designed to settle private disputes, and it would be "absurd" if "a private party in its capacity as [a] subject [could] hear, try, and rule [on] acts of authority." Id. at 424.

The court based its decision on two sources of law. First, the Eleventh Collegiate Court found that its public policy conclusion was "strengthened by" Section 98, the 2009 statute that forbade arbitrators from hearing administrative rescissions. Id. at 427. The Eleventh Collegiate Court quoted extensively from an explanatory article by the Mexican government describing the purpose of Section 98. That article explained that "it was a mistake to decide to exclusively leave to the force of the market the task of making economic decisions" and that it was essential to "generat[e] employment sources through public expenditures." Id. at 428-31. In light of Section 98, the Eleventh Collegiate Court concluded that "the current trend of the legislator regarding public works is to protect the economy and public expenditure by abandoning the practices that were aimed at granting more participation to private parties than to the State. Therefore, the State should be granted, once again, suitable mechanisms to fulfill those objectives." Id. at 431. The Eleventh Collegiate Court remarked that Section 98 was not being applied retroactively since it was being considered solely as a "guiding principle." Id. at 432.

The second source of law relied on by the Eleventh Collegiate Court was a 1994 decision of the Mexican Supreme Court. That decision, which did not discuss arbitration, had described administrative rescissions as "acts of authority." See Evidentiary Hearing Tr. at 47:9-48:14. Since "acts of authority" should not be arbitrated, the Eleventh Collegiate Court held, the arbitrators that heard the COMMISA/PEP dispute were without jurisdiction. Ex. MMM at 436-47.

13

As to the organic law by which PEMEX was organized and which authorized it to enter into arbitrations, the Eleventh Collegiate Court ruled that since PEMEX could have arbitrated the case if it had not declared an administrative rescission, there was no conflict between its decision and the organic law. Id. at 445-48. Furthermore, the issues arising from PEP's administrative rescission, and COMMISA's claims for breach of contract, were intertwined and inseparable, and since the arbitration panel lacked jurisdiction to hear the issues arising from the administrative rescission, it was barred as well from hearing the issues arising from the breach of contract. Id. at 439.

The Eleventh Collegiate Court held also that PEP had not waived its argument that the arbitrators lacked jurisdiction. The Eleventh Collegiate Court held that only private rights can be waived, and since PEP was acting as a public authority, it could not waive the rights of the public. The court found that the Fifth District Court had misinterpreted Article 1432 of Mexico's Commercial Code. Article 1432, the Eleventh Collegiate Court concluded, provides only that a party "may" take an immediate appeal of a preliminary award, but does not require a party to do so. Id. at 469.

The Eleventh Collegiate Court emphasized that administrative rescissions by the public party did not deprive the private contracting party of basic rights to have its claim adjudicated in a neutral forum. At several different points, the Eleventh Collegiate Court commented that COMMISA should have brought its breach of contract claims to the District Courts for Administrative Matters. The Mexican Supreme Court, when it considered COMMISA's amparo action in 2006, had found that COMMISA could have filed its claims in the District Courts for Administrative Matters. Thus, the Eleventh Collegiate Court ruled that "the matter should have been settled through a federal ordinary administrative proceeding heard

14

by a District Judge in Administrative Matters" and not by arbitrators. Id. at 418. The Eleventh Collegiate Court did not mention Article 14(VII), the 2007 law conferring jurisdiction to the Tax and Administrative Court to hear disputes about administrative rescissions, nor did the court discuss the March 2010 decision of the Mexican Supreme Court which held that the Tax and Administrative Court was the exclusive forum to hear such disputes.

The Eleventh Collegiate Court opinion instructed the Fifth District Court to nullify the Award. On October 25, 2011, the Fifth District Court did so. Its 46-page opinion echoed the rationale of the Eleventh Collegiate Court, finding that it would be "unacceptable and contrary to the country's legal system" to allow arbitrators "to resolve a matter of public policy and general interest." Ex. CCC at 25-26.

### h. Post-Nullification Litigation in Mexico

In addition to its efforts to have the Award in favor of COMMISA nullified, PEP filed and pursued two lawsuits in the Mexican courts that were consistent with the rationale of its administrative rescission: that it was COMMISA that breached the contract, not PEP. PEP filed suit seeking to recover against the sureties on the performance bond that COMMISA had posted to guarantee its full performance of the contract, and on October 24, 2011, the Second Unitary Court in Civil and Administrative Matters affirmed a lower court decision allowing the bonds to be enforced. As of the current date, PEP is owed the amount of the bond, approximately $80 million, plus interest of approximately $25 million. COMMISA sought relief by an indirect amparo proceeding, but the case was dismissed, and the parties inform me that judgment against COMMISA's sureties has not been perfected.

PEP also filed a finiquito, a proceeding similar to a judicial accounting in U.S. courts, in a Monterrey district court, seeking to collect additional funds that were not satisfied by

15

the performance bond. On April 16, 2013, the action was dismissed for having been filed in the wrong venue, but PEP has indicated that it plans to re-file the finiquito action.

COMMISA also pursued relief in the Mexican courts. COMMISA filed a damages claim against PEP in the Tax and Administrative Court on November 6, 2012. But the court held that the action was barred by the 45-day statute of limitations (which ran from the date of the administrative rescission, December 16, 2004), and that the 10-year statute of limitations, applicable to breach of contract actions in the district courts, did not apply. The court held also that COMMISA's action was barred by res judicata, based on the February 23, 2007 decision of the Sixth Collegiate Court finding that PEP had properly issued the administrative rescission.

COMMISA's parent company, KBR, also is planning legal action. On February 19, 2013, KBR sent a notice to the Mexican Government that it intended to pursue remedies under NAFTA for violations by the Mexican courts of NAFTA Article 1105, which requires a "fair and equitable treatment" of foreign investors in Mexico.[16] The nullification of the Award constituted such a violation, KBR argued.

### i. The Second Circuit's Remand and Ensuing Proceedings in the U.S. District Court

Meanwhile, the case was remanded to me for further proceedings. On PEP's motion, the U.S. Court of Appeals vacated the judgment I had issued and ordered me "to address in the first instance whether enforcement of the award should be denied because it 'has been set aside or suspended by a competent authority of the country in which, or under the law of which, the award was made.'" (quoting New York Convention Art. V(1)(e)). PEP promptly moved to dismiss COMMISA's petition to confirm the Award in COMMISA's favor, and for release of the funds PEP had deposited in the Court's Registry Investment Account to secure COMMISA's

---

[16] Article 1105(1) provides: "Each Party shall accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security."

16

judgment while PEP's appeal to the Second Circuit was pending.[17] COMMISA countered with a renewed motion to confirm its Award.

Pursuant to the remand, I ordered supplemental briefing to understand the obligations and discretion of a district judge under U.S. federal law in relation to the decrees of the Mexican courts nullifying the Award. I also needed to understand the extensive opinions of the Mexican courts, the litigation background between COMMISA and PEP, the nature of the remedy of administrative rescission and its possible interplay with arbitration, and if there was any remaining opportunity for COMMISA to obtain a full and fair hearing of the merits of its controversy with PEP. Because of the complexity of the issues and the divisions of opinion of the recognized experts on Mexican law that the parties presented to me, I conducted three days of hearings to receive the testimony of the experts, on April 10, 11 and 12, 2013.

Each side presented two experts at the hearing. COMMISA's first expert, Carlos Loperena, testified that the Eleventh Collegiate Court's opinion was contrary to Mexican law as it regarded arbitrations. Loperena criticized the Eleventh Collegiate Court's reliance on both the 1994 Mexican Supreme Court decision, which had not addressed arbitrations, and Section 98 of the Public Works Law, which had not been in effect when the parties entered into their contract. COMMISA's second expert, Dr. Claus Werner von Wobeser Hoepfner, testified that the Eleventh Collegiate Court's decision left COMMISA without a remedy to obtain a hearing on the merits of its claims. He testified that the Mexican Supreme Court's 2010 decision interpreting Article 14(VII) meant that the Tax and Administrative Court was to be the exclusive forum in which COMMISA could bring an action, and that its 45-day period of limitations barred COMMISA from filing a lawsuit in that court.

---

[17] On January 17, 2013, I granted PEP's motion to return the funds it had deposited, ruling that since a supersedeas bond had become inappropriate, so should PEP's deposit of $395 million in lieu of such a bond.

17

PEP's witnesses portrayed the Eleventh Collegiate Court's decision as consistent with the development of Mexican law. Dr. Francisco González de Cossío testified that the Mexican courts had long held that administrative rescissions were acts of authority, and that acts of authority cannot be arbitrated. As to the PEMEX organic law, which gave PEP authority to engage in arbitrations, Dr. González de Cossío testified that the law was only an enabling statute, giving PEP the authority to engage in arbitrations in some circumstances, but it did not require PEP to arbitrate when such arbitration would violate public policy. PEP's second expert, Roberto Hernández-García, testified that COMMISA continues to have a remedy in the Mexican courts. Article 14(VII), he said, was future oriented, and it did not apply to administrative rescissions that were issued prior to its enactment. Hernández-García testified that a retroactive application of the law would violate the Mexican constitution.

## III. THE PANAMA CONVENTION AND ENFORCEMENT OF ARBITRATION AWARDS

COMMISA's petition to confirm the Award in its favor invokes the Inter-American Convention on International Commercial Arbitration (the "Panama Convention"). See 9 U.S.C. § 305; John Bowman, The Panama Convention and its Implementation Under the Federal Arbitration Act, 11 Am. Rev. Int'l. Arb. 1, 91-94 (2000). The Panama Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") are largely similar, and so precedents under one are generally applicable to the other. See Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc., 23 F.3d 41, 45 (2d Cir. 1994) ("The legislative history of the [Panama] Convention's implementing statute . . . clearly demonstrates that Congress intended the [Panama] Convention to reach the same results as those reached under the New York Convention" such that "courts in the United States would achieve a general uniformity of results under the two conventions."). Article 4 of the Panama

18

Convention provides that an arbitration decision reached in a foreign country can be recognized in U.S courts "in the same manner as that of decisions handed down by national or foreign ordinary courts, in accordance with the procedural laws of the country where it is to be executed and the provision of international treaties."

The Panama Convention is enforceable pursuant to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 301; see Bowman, 11 Am. Rev. Int'l. Arb. at 70-72, 81-84. The FAA allows a party to an arbitral award falling under the Panama Convention to apply to a court for an order confirming the award. 9 U.S.C. §§ 302, 207. If the court determines it has jurisdiction, that court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." Id. "Under Article [5] of the [Panama Convention], '[t]he recognition and execution of the decision may be refused, at the request of the party against which it is made, only if such party is able to prove the existence of certain carefully specified defenses." Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru, 665 F.3d 384, 397 (2d Cir. 2011) (quoting Panama Convention Art. 5). While courts have some freedom to set aside arbitration awards if the award followed an arbitration in the court's own nation, "when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article [5] of the Convention." Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 23 (2d Cir. 1997) (citation omitted).

One of the specified grounds of Article 5 of the Panama Convention is relevant to this case. Article 5(e) provides:

> The recognition and execution of the decision may be refused, at the request of the party against which it is made, only if such party is able to prove to the competent authority of the State in which recognition and execution are requested . . . [t]hat the decision . . . has been annulled or suspended by a competent

19

> authority of the State in which, or according to the law of which, the decision has
> been made.

Thus, under Article 5 of the Panama Convention, I may set aside the Award if PEP can show that

a competent authority in Mexico annulled the award. Clearly, the Eleventh Collegiate Court is a

"competent authority." The question I have to decide is the meaning of "may set aside." In

other words, what is my discretion acting as a U.S. District Judge to confirm an award that a

foreign country has held to be invalid?

      A number of decisions address this issue of discretion. In <u>Baker Marine (Nig.)</u>

<u>Ltd. v. Chevron (Nig.) Ltd</u>, 191 F.3d 194 (2d Cir. 1999), Baker Marine (Nig.) Ltd., a barge

company, entered into a contract with its partner company, Danos and Curole Marine

Contractors, Inc., to provide barge services in Nigeria to the oil company Chevron Corp.

Claiming that both Danos and Chevron breached that contract, Baker Marine commenced

arbitration proceedings against the two companies and won two arbitration awards totaling

approximately $3 million. Baker Marine sought enforcement of the two awards in the Nigerian

courts, and Danos and Chevron appealed to those courts to vacate the awards. In two separate

decisions, the Nigerian Federal High Court set aside the awards, finding that "the arbitrators had

improperly awarded punitive damages, gone beyond the scope of the submissions, incorrectly

admitted parole evidence, and made inconsistent awards, among other things." <u>Id.</u> at 196.

Notwithstanding its loss in the Nigerian courts, Baker Marine sought to enforce the award in the

U.S. courts, filing a petition to confirm in the Northern District of New York. Baker Marine

simply sought to confirm the award and did not argue "that the Nigerian courts acted contrary to

Nigerian law." <u>Id.</u> at 197.

The District Court dismissed the petition to confirm, pursuant to the New York Convention.[18] The Second Circuit affirmed. While Baker Marine argued that Article 5's use of the term "may" meant that courts were allowed to confirm arbitration awards even if they had been vacated, the Second Circuit found the argument unconvincing given the facts of the case, writing "[i]t is sufficient answer that Baker Marine has shown no adequate reason for refusing to recognize the judgments of the Nigerian court." Id. at 197; see also TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 938 (D.C. Cir. 2007) ("Baker Marine is consistent with the view that, when a competent foreign court has nullified a foreign arbitration award, United States courts should not go behind that decision absent extraordinary circumstances not present in this case."); Spier v. Calzaturificio Tecnica, S.p.A., 71 F. Supp. 2d 279, 288 (S.D.N.Y. 1999) ("Spier's reference to the permissive 'may' in Article V(1) of the [New York] Convention does not assist him since, as in Baker Marine, Speir has shown no adequate reason for refusing to recognize the judgments of the Italian courts."). The Second Circuit further noted that "[i]f a party whose arbitration award has been vacated at the site of the award" could nonetheless "obtain enforcement of the award under the domestic laws of other nations, a losing party will have every reason to pursue its adversary 'with enforcement actions from country to country until a court is found, if any, which grants the enforcement.'" Baker Marine, 191 F.3d at 197 (quoting Albert Jan van den Berg, The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation 355 (1981)).

---

[18] The relevant portion of Article 5(1)(e) of the Panama Convention is substantially identical to the analogous portion of Article V(1)(e) of the New York Convention: "Reeognition and enforcement of the [arbitral] award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that . . . [t]he award . . . has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." See TermoRio S.A. E.S.P. Group, LLC v. Electranta S.P., 487 F.3d 928, 933 (D.C. Cir. 2007) ("[T]he relevant provisions of the Panama Convention and the New York Convention are substantively identical for [these] purposes . . . ."); Bowman, 11 Am. Rev. Int'l. Arb. at 59 ("The drafters of Article 5 of the Panama Convention incorporated Article V of the New York Convention almost verbatim.").

21

In TermoRio, the D.C. Circuit similarly declined to enforce an arbitration award that had been nullified. There, TermoRio S.A.E.S.P. entered into a contract with Electrificadora del Atlantico S.A.E.S.P. ("Electranta"), a Colombian state-owned utility, under which Electranta agreed to purchase electricity from TermoRio. TermoRio contended that Electranta breached the agreement by failing to buy the minimum amount of electricity specified in the contract, and an arbitration panel awarded TermoRio more than $60 million. Electranta brought an extraordinary writ before a Colombian court to challenge the arbitration award, and the court vacated the award. The Colombian court found that the arbitrators were required to conduct the arbitration in accordance with Colombian law, and that the procedures used by the arbitrators violated that law. 487 F.3d at 931.

In upholding the annulment of the arbitration award, the D.C. Circuit concluded that "[p]ursuant to [New York Convention Article V(1)(e)], a secondary Contracting State normally may not enforce an arbitration award that has been lawfully set aside by a 'competent authority' in the primary Contracting State." [19] Id. at 935. The D.C. Circuit found that because the relevant Colombian court was a competent authority and that "there is nothing in the record here indicating that the proceedings before the [Columbian court] were tainted or that the judgment of that court is other than authentic," the arbitration award should be set aside. Id. The D.C. Circuit observed that "[f]or us to [confirm the award] would seriously undermine a principal precept of the New York Convention: an arbitration award does not exist to be enforced in other Contracting States if it has been lawfully 'set aside' by a competent authority in the State in which the award was made. This principle controls the disposition of this case." Id. at 937.

---

[19] "Under the [New York] Convention, the country in which, or under the arbitration law of which, an award was made is said to have primary jurisdiction over the arbitration award. All other signatory States are secondary jurisdictions, in which parties can only contest whether that State should enforce the arbitral award." Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 364 (5th Cir. 2003) (footnote and internal quotation marks omitted).

22

However, there may be circumstances, the D.C. Circuit ruled, where an arbitration award should be confirmed despite a judgment of nullification in the primary state. The D.C. Circuit observed that there is a "narrow public policy gloss on Article V(1)(e) of the Convention and that a foreign judgment is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the United States." Id. at 939 (internal quotation marks omitted). In TermoRio, in the absence of evidence that the nullification proceedings or nullification judgment "violated any basic notions of justice to which we subscribe," the public policy gloss could not save a nullified award. Id.[20]

In contrast to the decisions in Baker Marine and TermoRio, the district court in Chromalloy Aeroservices, A Division of Chromalloy Gas Turbine Corp. v. Arab Republic of Egypt, 939 F. Supp. 907 (D.D.C. 1996), confirmed an arbitral award that had been rejected by a competent authority in the primary state. There, Chromalloy, an American military contractor, entered into an agreement with the Egyptian air force to provide parts, maintenance, and repair for helicopters used by the air force. Egypt cancelled the contract, and Chromalloy claimed the cancellation was a breach. An arbitration panel sided with Chromalloy, awarding the company more than $17 million. After Chromalloy filed a petition in the District Court of the District of Colombia to confirm the award, Egypt filed an emergency appeal with the Egyptian Court of Appeal, which issued an order overturning the award. The U.S. District Court declined to defer to the Egyptian court's decision, holding that since the parties' contract provided that the arbitrators' resolution "shall be final and binding and cannot be made subject to any appeal," Egypt had violated the terms of the contract when it appealed. Id. at 912. The court held also

---

[20] Baker Marine also suggested that there could be circumstances where a nullified award could be confirmed if the nullification violated public policy. See Baker Marine, 191 F.3d at 197 n.3 ("Recognition of the Nigerian judgment in this case does not conflict with United States public policy.").

23

that "[a] decision by this Court to recognize the decision of the Egyptian court would violate [the] clear U.S. public policy" in favor of enforcement of binding arbitration clauses. Id. at 913.

The broad holding of Chromalloy has been criticized. See TermoRio, 487 F.3d at 937 (declining to determine whether Chromalloy was correctly decided while noting that courts should defer to nullifications despite "the Convention policy in favor of enforcement of arbitration awards"); see also Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech., 763 F. Supp. 2d 12, 30 (D.D.C. 2011). However, Chromalloy remains alive, for both Baker Marine and TermoRio recognized that a district court should hesitate to defer to a judgment of nullification that conflicts with fundamental notions of fairness. See TermoRio, 487 F.3d at 939 (concluding that deferral is not warranted if doing so would violate "basic notions of justice"); Baker Marine, 191 F.3d at 197 n.3 (distinguishing Chromalloy on the ground that "recognition of the Nigerian judgment in this case does not conflict with United States public policy").

## IV. DISCUSSION AND ANALYSIS

Parties engaged in cross-border transactions often agree to arbitrate their disputes to promote both fairness, and the mutual perception of fairness, and to avoid foreign judicial systems and perceived favoritism to local parties, particularly if the local party is a government-owned, or politically powerful, entity. International law favors arbitration, and generally facilitates the enforceability of arbitrators' awards. However, national sovereignty runs strong, and sometimes results in judicial interventions, and even nullifications, of arbitration proceedings and awards. If that occurs, the courts of the nation in which the prevailing party

seeks to enforce the award in its favor may be presented with a dilemma: to enforce the
arbitration award, or to defer to the judgment nullifying the award.[21]

      This is the dilemma of this case, a dilemma that the remand of the Second Circuit
asks me to resolve. The issue, as it is framed by treaty, statute and case law is this: What, if any,
is the discretion of a court asked to confirm an arbitration award that has been nullified by a
competent authority of the state in which the arbitration was held?

      Under Article 5 of the Panama Convention as applied by the Federal Arbitration
Act, "recognition and execution of [the arbitral award] may be refused" if the award has been
nullified by a "competent authority" of the state in which, or according to the law of which, the
arbitration was conducted. The statutory phrase, "may," gives me discretion but, it appears from
the two important court of appeals cases on the subject, a narrow discretion.[22] The Second
Circuit in Baker Marine did not define the scope of discretion, ruling only that the party that had
won the arbitration did not give an "adequate reason" why comity should not be given to the
foreign court's judgment. 191 F.3d at 197. In TermoRio, the D.C. Circuit gave a more
substantive definition of the enforcing court's discretion: if the judgment of nullification "is
repugnant to fundamental notions of what is decent and just in the United States" or, stated
another way, if the judgment "violated any basic notions of justice in which we subscribe," then
it need not be followed. 487 F.3d at 939.

      I find that under the standard announced in TermoRio, the decision vacating the
Award violated "basic notions of justice," and that deference is therefore not required.

---

[21] Cf. Radu Lelutiu, Note, Managing Requests for Enforcement of Vacated Awards Under the New York
Convention, 14 Am. Rev. Int'l Arb. 345, 351 (2004) (observing that it is not unusual for arbitration awards to be
vacated because "the breaching party is not infrequently a government entity in whose rescue national courts are
eager to graciously aid").

[22] At argument, I read the cases as giving me a "wee small area of discretion." May 10, 2012 Transcript at 2:19-22.

25

When COMMISA initiated arbitration at the end of 2004, it had every reason to believe that its dispute with PEP could be arbitrated. Twice PEP had signed an agreement stating that disputes related to the gas platforms contracts would be arbitrated. The arbitration clause was broadly worded and mandatory, providing that "[a]ny controversy, claim, difference, or dispute that may arise from or that is related to, or associated with, the present Contract or any instance of breach with the present Contract, shall be definitely settled through arbitration . . . ." Ex. 2 § 23.3. PEP had the authority to enter into such an arbitration provision, as the organic law that gave PEP its existence specifically authorized it to resolve commercial disputes by arbitration. See Ex. MMM at 443, Section 14 of the PEMEX and Affiliates Organic Law ("In the event of international legal acts, Petróleos Mexicanos or its Affiliates may agree upon the application of foreign law, the jurisdiction of foreign courts in trade matters, and execute arbitration agreements whenever deemed appropriate in furtherance of their purpose.").

NAFTA, the trade agreement that Mexico, the United States, and Canada executed in 1992, was to the same effect. It authorized arbitration of disputes between private parties and a signatory nation in cases where state enterprises had contracted in the public interest. See North American Free Trade Agreement, U.S.-Can.-Mex., Dec. 17, 1992, 32 I.L.M. 289 (1993), art. 1116. Clearly, Mexico had agreed that it could be subject to arbitration in cases just like the one before us, and indeed COMMISA's parent, KBR, has sought just an arbitration. The fact that Mexico had agreed that it could engage in arbitration suggests that Mexico believed its instrumentalities were subject to arbitration as well.

Moreover, PEP's own conduct showed that it considered itself subject to arbitration. PEP's initial arguments against arbitration had nothing to do with a "public policy" against allowing state enterprises to enter arbitration, but instead were focused on narrow,

26

technical grounds. PEP argued, among other things, that COMMISA had waived its claims by filing an amparo action, and that COMMISA had failed to properly exhaust other options before seeking arbitration. See Ex. 87 at 12-16. Even after the Mexican Supreme Court issued its June 23, 2006 ruling that the administrative rescission statutes were valid and constitutional, PEP's arguments against arbitration were based on the principle of res judicata, not public policy. It was not until October 2007, nearly three years after COMMISA initiated the arbitration, that PEP made the argument that public policy forbade arbitration.[23]

Indeed, it was not until May 28, 2009, when Section 98 of the Law of Public Works and Related Services came into effect, that there was a source of law that supported the argument that the parties' dispute was not arbitrable. The statute provided: "[t]he administrative rescission, early termination of the contracts and such cases as the Regulation of this Law may determine may not be subject to arbitration proceedings." Ex. MMM at 427. The Eleventh Collegiate Court relied heavily on Section 98 in its decision to strike down the arbitration award in favor of COMMISA. The purpose of the law, according to the Eleventh Collegiate Court, was "to protect the economy and public expenditure by abandoning the practices that were aimed at granting more participation to private parties than to the State." Id. at 431. It therefore followed that it "would be contrary to public policy" to allow PEP, an entity that was so important to the public expenditure, to be subject to a dispute resolution procedure governed by private parties. Id. at 432.

The Eleventh Collegiate Court stated that it was not applying Section 98 retroactively, but only as a "guiding principle," and that a 1994 Mexican Supreme Court decision supported its conclusion. Id. at 432, 436-37. However, the 1994 decision did not mention

---

[23] Even PEP's own witness, Doctor Francisco González de Cossió, expressed doubts about the strength of the public policy argument. In a 2008 article, González de Cossió said of this argument: "its success has been virtually zero." Ex. 96 at § III.D.a.

arbitration, and its relevance to this case was so marginal that PEP failed to cite it during the

initial years of the parties' litigation. The decision seems to be available only in extract, as the

parties represented in response to the court's inquiry. See Evidentiary Hearing Tr. at 79:11-

80:17. Based on the Eleventh Collegiate Court's extensive discussion of Section 98, it was this

law, not the 1994 Mexican Supreme Court decision, that was critical to its decision. See Ex.

MMM at 427-32.

Thus, retroactive application of laws and the unfairness associated with such

application is at the center of the dispute before me:

> Elementary considerations of fairness dictate that individuals should have an
> opportunity to know what the law is and to conform their conduct accordingly;
> settled expectations should not be lightly disrupted. For that reason, the
> "principle that the legal effect of conduct should ordinarily be assessed under the
> law that existed when the conduct took place has timeless and universal appeal."
> In a free, dynamic society, creativity in both commercial and artistic endeavors is
> fostered by a rule of law that gives people confidence about the legal
> consequences of their actions.

Landgraf v. USI Film Products, 511 U.S. 244, 265-66 (1994) (citation omitted). Here, the law at

the time of the parties' contracting gave COMMISA the "settled expectation" that its dispute

could be arbitrated. The 1994 Mexican Supreme Court decision was not sufficient to put

COMMISA on notice that the statute that specifically empowered PEP to arbitrate and the

arbitration clauses PEP had agreed to should have been ignored.

Further, this retroactive application of Section 98 was undertaken to favor a state

enterprise over a private party. The Eleventh Collegiate Court explained that administrative

recissions helped "safeguard [the state's] financial resources" and that "the State should be

granted . . . suitable mechanisms to fulfill [this] objective[]." Ex. MMM at 422, 431. This

rationale flouts a basic principle of justice: where a sovereign has waived its immunity and has

agreed to contract with a private party, a court hearing a dispute regarding that contract should

treat the private party and the sovereign as equals. See United States v. Winstar Corp., 518 U.S. 839, 895 (1996) ("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (citation omitted); United States v. Bostwick, 94 U.S. 53, 66 (1877) ("The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf."); Cooke v. United States, 91 U.S. 389, 398 (1875) (finding that when the United States "comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there").

Applying a law that came into effect well after the parties entered into their contract was troubling. But this unfairness was exacerbated by the fact that the Eleventh Collegiate Court's decision left COMMISA without a remedy to litigate the merits of the dispute that the arbitrators had resolved in COMMISA's favor.

Throughout the litigation in Mexico, the Mexican courts recognized that the parties' dispute could have been brought in the Mexican courts. In its June 23, 2006 decision, the Mexican Supreme Court observed that "there is no obstacle or restriction whatever against a private party . . . [filing] within the relevant time periods . . . an administrative dispute proceeding, thereby triggering intervention by the relevant court, if [the aggrieved party] . . . has been adversely affected by the cancellation of the administrative contract for public works to which it was a party." Ex. LLL at 71. This right to judicial recourse was essential to the Mexican Supreme Court's conclusion that administrative rescissions were constitutional, and not arbitrary cancellations of the contract rights of private counter-parties. Thus, the Eleventh Collegiate Court justified its judgment of nullification by observing that the case "may have been

contested by filing a federal ordinary administrative action before a District Judge in

Administrative Matters to analyze the substantive matter." Ex. MMM at 434.

But by the time the Eleventh Collegiate Court issued its opinion, this option was

no longer available to COMMISA. Article 14(VII) of the Organic Law of the Federal Court in

Tax and Administrative Matters, a 2007 statute, gave the Tax and Administrative Court

jurisdiction over public works cases involving Mexican state entities. That court has a short, 45-

day statute of limitations. Based on that statute, the Mexican Supreme Court held in 2010 that

the Tax and Administrative Court was the exclusive forum for such cases. The necessary

implication is that the District Courts for Administrative Matters, in which a 10-year statute of

limitations applies, are not available to hear disputes like this one. COMMISA tested this issue,

filing suit in the Tax and Administrative Court on November 6, 2012, arguing that the 10-year

statute of limitations should apply, but COMMISA's argument was rejected and the case was

dismissed barely a month after its filing. The Tax and Administrative Court held that

COMMISA's suit was barred by both the statute of limitations and by res judicata.[24] This lack of

remedy is particularly unjust because COMMISA has been deemed to owe damages to PEP,

even though there has been no full hearing on the merits outside arbitration, simply because PEP

issued an administrative rescission.

For these reasons, this is a very different case from Baker Marine and from

TermoRio. In neither of those cases did the annulling court rely on a law that did not exist at the

---

[24] PEP's expert Roberto Hernández-García testified that he believed that COMMISA still has a remedy in the
Mexican courts, despite Article 14(VII). He contended that Article 14(VII) should not apply because it is a future
oriented law and because the Mexican constitution forbids retroactive application of laws. See Evidentiary Hearing
Tr. at 309:4-12; 315:25-316:6. However, I found the testimony of COMMISA's witness, Dr. Claus Werner von
Wobeser Hoepfner, more convincing. Von Wobeser Hoepfner testified that Article 14(VII) could be applied to
actions filed before the statute's enactment because it is considered a procedural law, and such laws are applied
retroactively. See Evidentiary Hearing Tr. at 181:20-182:1, 201:20-202:14. Moreover, the Tax and Administrative
Court recently rejected COMMISA's claims on the additional ground that res judicata barred the action. Even if
COMMISA could somehow pass these legal hurdles, re-litigation in the Mexican courts would add undue and
unreasonable delay to a case that has already lasted almost 10 years.

30

time of the parties' contract. In both Baker Marine and TermoRio, the nullification was based on the failure of arbitrators to follow proper procedure. The courts of Nigeria and Colombia did not hold that the cases could not be subject to arbitration, and therefore there was no contradiction between the government entities' agreements to arbitrate and the courts' rulings. Here, in contrast, the Eleventh Collegiate Court ruled that the entire case was not subject to arbitration based on public policy grounds, a ruling that was at odds with PEP's own agreement, the PEMEX enabling statute, and the law of Mexico at the time of contracting and the commencement of arbitration.

In declining to defer to the Eleventh Collegiate Court, I am neither deciding, nor reviewing, Mexican law. I base my decision not on the substantive merit of a particular Mexican law, but on its application to events that occurred before that law's adoption. At the time COMMISA brought its claims against PEP, there was no statute, case law, or any other source of authority that put COMMISA on notice that it had to pursue its claims in court, instead of in arbitration. COMMISA reasonably believed that it was entitled to arbitrate the case, and the Eleventh Collegiate Court's decision disrupted this reasonable expectation by applying a law and policy that were not in existence at the time of the parties' contract, thereby denying COMMISA an opportunity to obtain a hearing on the merits of its claims. The decision therefore violated basic notions of justice, and I hold that the Award in favor of COMMISA should be confirmed.

## V. CONCLUSION

For the reasons stated in this opinion, I grant COMMISA's renewed motion to confirm the Award, and I deny PEP's motion to dismiss COMMISA's petition. The clerk shall mark the motions (Docs. No. 83 and 89) terminated.

31

Several issues remain before this case can be closed: the amount of the judgment

to be entered in COMMISA's favor, whether that judgment should reflect COMMISA's

obligations under its performance bonds and the judgment in Mexico in favor of PEP against

COMMISA's sureties with respect to those bonds, the re-deposit by PEP of a cash deposit in lieu

of a supersedeas bond, and any other appropriate matters. These issues can be discussed with me

at a conference to be held September 12, 2013, at 3 p.m. Counsel shall confer before the

conference and jointly propose, in a single letter to be sent to the court by September 9, 2013, an

agenda for the conference and their respective positions on the issues to be discussed.

SO ORDERED.

Dated:      August 27, 2013
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

32